IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **MARC PANASUK, DAVID ROSS, AND DAVID JOHN THOMAS** on behalf of themselves and all others similarly situated, | : : : : : | **CIVIL ACTION NO.** 1:09-cv-00066-TLS-RBC |
| Plaintiffs, | : : | |
| v. | : : | |
| **STEEL DYNAMICS, INC., KEITH BUSSE,** and **JOHN C. BATES**, | : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |

**PLAINTIFFS' OMNIBUS MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ..................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................ 1

III. LEGAL STANDARDS ............................................................................. 7

IV.  DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT
     SHOULD BE DENIED ............................................................................. 9

     A.   The Complaint Alleges With Particularity Defendants' False
          and Misleading Statements Constituting Fraud ............................. 9

          1. The Complaint Alleges the "Who, What, When and Where" ............... 9

          2.   The Complaint Particularizes Reasons "Why"
               Defendants' Statements Were False or Misleading ........................ 9

     B.   The Complaint Adequately Pleads Scienter ................................... 11

          1.   Defendants Were Knowledgeable About SDI's Core
               Operations to Support A Cogent Inference of Scienter ................. 12

          2.   Bates' Insider Trading in SDI Common Stock Further
               Supports A Cogent Inference of Scienter .................................... 16

          3.   Scienter Can Be Imputed to SDI .................................................. 20

     C.   The Complaint Adequately Alleges False And Misleading
          Statements Attributable To Bates ................................................... 22

          1.   Bates Is Liable for the Statements in SDI's 2008 10-K
               Because He Signed The Document ............................................... 22

          2.   Bates is Liable for the False and Misleading Statements
               Made in the Press Release ............................................................ 27

          3.   Bates is Liable For the False and Misleading Statements
               Made During the January 27, 2009 Earnings Conference Call ..... 28

     D.   Defendants' Projections Are Not Protected by the PSLRA's
          Safe Harbor Provision .................................................................... 29

      1.     The Safe Harbor Provision Does Not Apply to Defendants' Misstatements of Current or Historical Facts ................................... 30

      2.     General Cautionary Language Does Not Insulate Misleading Projections ................................................................. 31

      3.     The Safe Harbor Provision Is Inapplicable Because Defendants Had Actual Knowledge of the Falsity of Their Statements .......................................................................... 33

           a.     Defendants' Projections Lacked a Reasonable Basis................................................................................. 33

  E.     The Complaint Adequately Pleads Loss Causation.................................... 34

  F.     The Complaint Sufficiently Alleges Control Person Liability ................. 37

V.    CONCLUSION ................................................................................................. 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598 (N.D. Cal. 1991) ....................................25

*Asher v. Baxter International Inc.*, 377 F.3d 727 (7th Cir. 2004) ....................................30, 31, 32

*Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005) ....................................29

*Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. June 5, 2008) ....................32

*Blatt v. Corn Products International, 2006*, U.S. Dist. LEXIS 39383 (N.D. Ill. June 14, 2006)....................................................................................................................30

*Brumbaugh v.. Wave Sys. Corp.*, 416 F. Supp. 2d 239(D. Mass. 2006)....................................32

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645 (7th Cir. 1997)....................................7

*Caterpillar v. Great America Insurance Co.*, 62 F.3d 955 (7th Cir. 1995)....................................20

*Cellular Technology Services Co. v. TruePosition, Inc.*, 609 F. Supp. 2d 223 (D. Conn. 2009)....................................................................................................................37

*Central Laborers' Pension Fund v. Sirva, Inc.*, 2006 U.S. Dist. LEXIS 73375 (N.D. Ill. Sept. 22, 2006)........................................................................................................31

*City of Austin Police Retirement System v. ITT Education Services, Inc.*, 388 F. Supp. 2d 932 (S.D. Ind. 2005) ........................................................................................13

*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) ....................................24

*DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708 (N.D. Ill. 2005) ....................................26

*Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923 (N.D. Ill. 1999)....................................12, 13

*Dardick v. Zimmerman*, 149 F. Supp. 2d 986 (N.D. Ill. 2001)....................................13

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005) ....................................26

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ....................................7

*Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130 (7th Cir. 1992)....................37

*Dura Pharmaceuticals, Inc. v. Broudo* , 544 U.S. 336 (2005)....................................34

*EP MedSystems, Inc. v. Echocath, Inc.*, 235 F.3d 865 (3d Cir. 2000) .......................................... 30

*Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).................................... 39

*Feldman v. Motorola, Inc.*, 1993 U.S. Dist. LEXIS 14631 (N.D. Ill. Oct. 14, 1993) .................. 26

*Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540 (7th Cir. 2005) .................................................. 37

*Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wis. 2003) ............................................. 7

*Hayley v. Parker*, 2001 U.S. Dist. LEXIS 23255 (C.D. Cal. Aug. 31, 2001) .............................. 18

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753(7th Cir. 2007) .................................................... 20

*Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000) ............................................. 22, 23

*In re 21st Century Holding Co. Securities Litigation*, 2008 U.S. Dist. LEXIS 108196
(S.D. Fla. Nov. 7, 2008) .............................................................................................................. 32

*In re Allied Products Corp.*, 2000 U.S. Dist. LEXIS 16781 (N.D. Ill. Nov. 15, 2000) ............... 16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litigation*, 324 F. Supp. 2d 474 (S.D.N.Y.
2004)............................................................................................................................................. 14

*In re Bally Total Fitness Sec. Litigation*, 2006 U.S. Dist. LEXIS 93986 (N.D. Ill. July 12,
2006)............................................................................................................................................. 35

*In re Cabletron System, Inc.*, 311 F.3d 11 (1st Cir. 2002) ..................................................... 20, 22

*In re Connetics Corp. Sec. Litigation*, 542 F. Supp. 2d 996 (N.D. Cal. 2008)...................... 24, 25

*In re Discovery Zone Sec. Litigation*, 169 F.R.D. 104 (N.D. Ill. 1996) ....................................... 26

*In re General Instrument Corp. Sec. Litigation*, 1999 U.S. Dist. LEXIS 18182 (N.D. Ill.
Nov. 15, 1999).............................................................................................................................. 26

*In re Global Crossings, Ltd. Sec. Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)................... 28

*In re Guidant Corp. Sec. Litigation*, 536 F. Supp. 2d 913 (S.D. Ind. 2008) ............................... 26

*In re HealthCare Compare Corp. Sec. Litigation*, 75 F.3d 276 (7th Cir. 1996) ........................... 12

*In re Hollinger International, Inc. Sec. Litigation*, 2006 U.S. Dist. LEXIS 47173 (N.D.
Ill. June 28, 2006)........................................................................................................................ 36

*In re JP Morgan Chase & Co. Securities Litigation*, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007)..................................................................................................................17

*In re LDK Solar Sec. Litigation*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................................19

*In re Motorola Sec. Litigation*, 2004 U.S. Dist. LEXIS 18250 (N.D. Ill. Sept. 10, 2004)......16, 22

*In re Nash Finch Co. Sec. Litigation*, 502 F. Supp. 2d 861 (D. Minn. 2007) ..............................34

*In re NeoPharm, Inc. Sec. Litigation*, 2003 U.S. Dist. LEXIS 1862 (N.D. Ill. Feb. 7, 2003)........................................................................................................................................10

*In re Nortel Networks Corp. Sec. Litigation*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................33

*In re Northfield Laboratories, Inc. Securities Litigation*, 2008 U.S. Dist. LEXIS 76804 (N.D. Ill. Sept. 23, 2008) ..............................................................................................................35

*In re Reliance Sec. Litigation*, 91 F. Supp. 2d 706 (D. Del. 2000) ...............................................26

*In re Scott Paper Co. Sec. Litigation*, 142 F.R.D. 611 (E.D. Pa. 1992) ........................................25

*In re Scottish Re Group Sec. Litigation*, 524 F. Supp. 2d 370 (S.D.N.Y. 2004)...........................14

*In re Sears, Roebuck & Co. Sec. Litigation*, 291 F. Supp. 2d 722 (N.D. Ill. 2003) .....................12

*In re Secure Computing Corp. Sec. Litigation*, 184 F. Supp. 2d 980 (N.D. Cal. 2001)...............18

*In re Shopko Sec. Litigation*, 2002 U.S. Dist. LEXIS 23887 (E.D. Wis. Nov. 5, 2002)...............13

*In re Splash Technology Holdings Sec. Litigation*, 2000 U.S. Dist. LEXIS 15369 (N.D. Cal. Sept. 29, 2000) ....................................................................................................................32

*In re Spyglass, Inc. Sec. Litigation*, 1999 U.S. Dist. LEXIS 11382 (N.D. Ill. July 20, 1999)...............................................................................................................................................18

*In re System Software Associates Sec. Litigation*, 2000 U.S. Dist. LEXIS 3071 (N.D. Ill. Mar. 8, 2000) ...............................................................................................................................17

*In re Tut Sys. Sec. Litigation.*, 2002 U.S. Dist. LEXIS 27092, (N.D. Cal. Aug. 15, 2002) ..........18

*In re U.S. Interactive, Inc. Sec. Litigation*, 2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002)........................................................................................................................................33

*In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188 (N.D. Ill. 2009) ..12, 16, 34

*In re VeriSign, Inc. Sec. Litigation*, 2005 U.S. Dist. LEXIS 10439 (N.D. Cal. Jan. 13, 2005) ...................................................................................................................25

*In re Westell Technologies, Inc. Sec. Litigation*, 2001 U.S. Dist. LEXIS 17867 (N.D. Ill. Oct. 26, 2001) ...........................................................................................13, 17

*In re Westinghouse Sec. Litigation*, 90 F.3d 696 (3d Cir. 1996) ......................................32

*In re Worldcom, Inc. Sec. Litigation*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ..................20

*Knowles v. Hopson*, 2008 U.S. Dist. LEXIS 46106 (N.D. Ill. June 12, 2008)...........16, 17

*La Mar  v. H & B Novelty Loan Co.*, 489 F.2d 461 (9th Cir. 1973)..................................23

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ..........................................37

*Lewis v. Straka*, 535 F. Supp. 2d 926 (E.D. Wis. 2008)..............................................8, 13

*Lindelow v. Hill*, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 20, 2001).......................13

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) ........19

*Lormand  v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)....................................32, 36

*Lujan v. Defenders Of Wildlife*, 504 U.S. 555 (1992) ......................................................24

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) ...........7, 8, 17

*McConville v. SEC*, 465 F.3d 780 (7th Cir. 2006)............................................................27

*Middlesex Retirement System v. Qwest Software, Inc.*, 2008 U.S. Dist. LEXIS 68419 (C.D. Cal. July 10, 2008).................................................................................................28

*No 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) .................................................................................19

*Noller v. Grubbs*, 2005 U.S. Dist. LEXIS 15473 (S.D. Ind. Jul. 25, 2005) ......................7

*Nordstrom, Inc. v. Chubb & Son, Insurance*, 54 F.3d 1424 (9th Cir. 19095) .................20

*Norfolk County Retirement System v. Ustian*, 2009 U.S. Dist. LEXIS 65731 (N.D. Ill. July 28, 2009) ....................................................................................................................35

*Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871 (N.D. Ill. 2004)........................30, 31

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004)........................................19

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002)................................................23

*Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003).............................................19

*Ray v. Citigroup Global Markets*, 482 F.3d 991 (7th Cir. 2007) ...............................34, 35

*Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir. 1992).........................24

*Ruskin v. TIG Holdings, Inc.*, 2000 U.S. Dist. LEXIS 11517 (S.D.N.Y. Aug. 14, 2000).............33

*S.E.C. v. First New Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996) ....................27

*Schlagel v. Learning Tree International*, 1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 29, 1998)....................................................................................................18

*Schleicher v. Wendt*, 291 F. Supp. 2d 959 (S.D. Ind. 2007)...............................12, 16, 35

*Schleicher v. Wendt*, 529 F. Supp. 2d 959 (S.D. Ind. 2007)...............................16, 35, 36

*Schleicher v. Wendt*, 2009 U.S. Dist. LEXIS 24810 (S.D. Ind. March 20, 2009)...............24

*Scholes v. Stone, McGuire and Benjamin*, 143 F.R.D. 181 (N.D. Ill. 1992)...................24

*Schultz v. TomoTherapy Inc.*, 2009 U.S. Dist. LEXIS 58631 (W.D. Wis. July 9, 2009)............39

*Selbst v. McDonald's Corp.*, 2005 U.S. Dist. LEXIS 23093 (N.D. Ill. Sept. 21, 2005)....12, 30, 34

*Sequel Capital, LLC v. Rothman*, 2003 U.S. Dist. LEXIS 20967 (N.D. Ill. Nov. 20, 2003)..12, 13

*Silverman v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 76799 (N.D. Ill. Sept. 23, 2008)...............36

*Southland Sec. Corp. v. INSpire Insurance Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004)......21, 22

*Stransky v. Cummins Engine Co.*, 51 F.3d 1329 (7th Cir. 1995) ...........................10, 11

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977) .......................8

*Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006)...................17, 19, 30

*Teachers' Retirement System v. Hunter*, 477 F.3d 162 (4th Cir. 2007).........................37

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. June 26, 2008) ........................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,(Tellabs I)*, 127 S. Ct. 2499 (2007).................*passim*

*Makor Issues & Rights, ltd. v. Tellabs, Inc. (Tellabs II)*, 513 F.3d 702 (7th Cir. 2008) .......*passim*

*Triad Associates v. Chicago Housing Authority*, 892 F.2d 583 (7th Cir. 1989) ............................7

*Trooien v. Mansour*, 2008 U.S. Dist. LEXIS 41307 (D. Minn. May 23, 2008)...........................12

*United States v. Ataya*, 864 F.2d 1324 (7th Cir. 1988)..................................................................32

*Upton v. McKerrow*, 887 F. Supp. 1573 (N.D. Ga. 1995)..............................................................24

*Walsh v. Chittenden Corp.*, 798 F. Supp. 1043 (D. Vt. 1992)...........................................23, 24, 25

*Walton Risk Services v. Clarendon America Insurance Co.*, 2002 U.S. Dist. LEXIS 20650 (N.D. Ill. Oct. 25, 2002) ................................................................................................30

*Weiss v. Winner's Circle*, 1995 U.S. Dist. LEXIS 18713 (N.D. Ill. Dec. 14, 2995) ...................23

*Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110 (C.D. Cal. 2005)............................................32

## FEDERAL STATUTES

15 U.S.C. §78j(b).............................................................................................................................1

15 U.S.C. §78(t)(a) ..........................................................................................................................1

15 U.S.C. §78u-4(b)(1)(B) ..............................................................................................................9

15 U.S.C. §78u-5(c)(1)(A) ............................................................................................................29

15 U.S.C. §78u-5(c)(1)(B)..............................................................................................................34

Fed. R. Civ. P. 8(a) ........................................................................................................................34

17 C.F.R Sections 210.1 - 01 .........................................................................................................29

17 C.F.R Section 229.10..................................................................................................................29

Exchange Act of 1934 ("Exchange Act").........................................................................................1

## I.     INTRODUCTION

This is a securities class action brought by court-appointed lead plaintiffs, David Ross and David John Thomas (collectively hereinafter "Plaintiffs") on behalf of all persons who purchased or otherwise acquired the common stock of Steel Dynamics, Inc. ("SDI" or the "Company") between January 27, 2009 and March 11, 2009 (the "Class Period"). ¶1.[1]  The Amended Class Action Complaint (the "Complaint") charges SDI, Keith E. Busse ("Busse"), co-founder, Chief Executive Officer ("CEO") and director of SDI, and John C. Bates ("Bates"), co-founder, "non-independent" director and the largest individual shareholder of SDI (collectively hereinafter "Defendants") with violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and § 78t(a), by making false and misleading statements and failing to disclose adverse material facts known to them concerning SDI.

Defendants have filed motions to dismiss the Complaint.  For the reasons set forth herein, Defendants' motions should be denied in their entirety.

## II.     STATEMENT OF FACTS

SDI is the nation's fifth largest producer of carbon steel products. ¶ 10.  Since 1993, Busse, a co-founder of the Company, has been SDI's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors.  ¶ 11.A.  In 2008, Busse was also chairman of the American Iron and Steel Institute, speaking at its annual convention on steel demand in the United States an as well as globally. ¶ 11.A.  Bates, also a co-founder of the Company, is and has been a "non-independent" director of the Company since 1994.   ¶ 11.B.   Bates is the single largest shareholder of SDI. ¶ 11.B.   Since 1993, Bates has also been the President, Chief Executive Officer and a director of Ohio-based Heidtman Steel Products, Inc ("Heidtman Steel"), a world

---

[1] References to Plaintiffs' July 13, 2009 Amended Class Action Complaint are cited as "¶___."

leader in marketing flat-rolled carbon steel products. ¶ 11.B. Heidtman Steel is also SDI's single largest customer. ¶¶ 10. In its most recent proxy, SDI described Bates' unique relationship with SDI as follows: "Mr. Bates is considered a non-independent outside director as a result of ownership and control of Heidtman Steel, a substantial purchaser of steel from our Company and, therefore, precluded from being considered independent." ¶¶ 2, 11.B.

During the Class Period, Defendants were engaged in a common course of conduct during which they made a series of false and misleading statements concerning SDI's inventory levels, steel operations and shipments, and financial results, including issuing false and misleading earnings guidance for the first quarter of 2009, the three months ended March 31, 2009 (Q1 2009). Defendants' false and misleading statements were made in: 1) SDI's Q4 2008 Press Release ("Q4 2008 Press Release"), filed with the SEC in a Form 8-K, 2) SDI's Q4 earnings conference call with securities analysts ("Q4 2008 Earnings Conference Call"), and 3) SDI's SEC Form 10-K for the year ended December 31, 2008 ("2008 10-K").

On January 26, 2009, after the close of the market, SDI issued the Q4 2008 Press Release and filed the Form 8-K. ¶ 25. In the Q4 2008 Press Release, the Company announced another strong year of growth, achieving record full-year 2008 results despite weak fourth-quarter sales and shipments and fourth-quarter losses from unrealized hedging losses and inventory write-downs. ¶ 25. In the Q4 2008 Press Release, Busse stated:

> It is strange to be reporting the best year in the company's history and at the same time the company's worst quarter. The steel industry took it on the chin in the fourth quarter as orders dried up, and Steel Dynamics was not exempted. The combination of weaker demand, inventory reductions in both distribution and at the OEM level, and the commercial paralysis brought about by tight credit markets led to very slow order activity. This resulted in fourth-quarter production curtailments at our mills and metals-recycling facilities. We have started the new year with somewhat better activity, but we cannot be certain how long it will take the steel and scrap markets to return to more normal demand patterns. All of our SDI facilities are currently operating well

below capacity. However, the company is prepared to ramp up very quickly with any pick-up in business activity.

We believe that SDI is well positioned with our low, variable cost structure and state-of-the-art facilities that are capable of cost-effectively producing excellent, high-quality products. We are optimistic that, even if we continue to encounter lackluster demand for steel and scrap for several quarters, we will return to profitability in the first quarter and remain profitable in 2009, assuming no recurrence of dramatic price swings such as those experienced in the second half of 2008. **Our very preliminary estimate is that we could achieve earnings of $0.05 to $0.15 per diluted share in the first quarter.** If needed, further guidance will follow later in the quarter as visibility improves. We continue to believe that earnings for the full year 2009 could, under somewhat improved circumstances, be comparable to those achieved in 2008. We are focusing on cash management and controlling costs tightly, utilizing free cash flow to continue to pay down debt on our revolving line of credit and continue funding capital expenditures for critical projects that are underway. (emphasis added)

¶ 26.

Subsequently, on January 27, 2009, the Company held its Q4 2008 Earnings Conference Call, in which Busse and others from SDI participated, providing detailed information concerning SDI's Q4 2008 results and the impact on SDI's 2009 results. ¶ 27. For example, defendant Busse began by stating,

I think I'll probably lead off with the opening statement in the fifth paragraph of our press release, which says it's strange to be reporting the best year in the company's history and at the same time the company's worst quarter and we're thankful to have that quarter behind us.

That quarter obviously was full of pain and agony, most of which was felt in our scrap and scrap processing divisions where substantial losses, . . . were incurred, which would tell you that most of the loss we're reporting was at this point in time in that segment and – as expected, I think - and much of it was operating in nature. When scrap goes from $875 a ton, for prime goods, down to $175 a ton month–by–month until it reached its bottom you can imagine the losses were substantial. And I'm happy to be able to report that we think that the processing division will be back in the black in the first quarter and we'll have an operating profit during the quarter. So we're please about that.

Busse also stated,

So, we will generate decent earnings – not decent, but I mean, given the fourth quarter climate, rebounding earnings, let's put it that way. We had earnings in the fourth quarter but offset by other issues from a total company perspective, but we should generate earnings in the first quarter in almost all of our steel divisions.

¶ 27.

In discussing inventory levels, Busse stated:

I might just briefly comment on our inventories. As Mark said earlier, the inventories at the scrap processing unit are in pretty good shape, but flow is running at what would you say, half speed, or thereabout. So flow is down due to the industrial environment and we operate for the most part in a winter climate where flows are impacted seasonally as well. So – and of course flows would be down because of the automotive shutdowns that occurred throughout in late December and have continued throughout the month of January.

Inventories at our steel divisions are really in bad shape, at four of the five. The pricing is in good shape now at five of the five, you might say, but we have a lot of inventory at Butler. We probably – and when you look at it all collectively, the push come to shove, we can probably wring 75 to $100 million of cash out of those inventories by allowing them to decline. It's tough to get them to decline when you're operating at only about 50%, thus they've remained high at flat-rolled throughout the quarter, but as I said in really in pretty good shape elsewhere throughout the company. So, we still could flush some cash out of inventory if it were necessary but don't believe that that will be necessary.

¶ 28.

With respect to the assumptions SDI made as to operating capacity, Busse stated that "we will run our flat-rolled divisions at about 60% in the first quarter," and that "steel of West Virginia . . . continues to operate at about 45% of capacity." ¶ 29. In the question and answer session, the following discussion occurred in which Busse responded to analyst questioning:

Q: Okay, and then with regard to the operating rate you're saying that – if I understand correctly that you're looking for a 60% kind of capital utilization rate in first quarter but the industry is running at kind of the mid to low 40s. I was just trying to kind of close the circle there between given the rest of the industry-wide – the industry overall showing a lower rate than you are?

4

A: Yeah, that was just in flat-rolled, that 60%. We're probably going to operate at about 33% to 40% best case in Structural, and probably somewhere around 60% best case in engineered bars, 50 to 60%, same way with small shape. So, the aggregate is something less than 60% for the quarter.

¶ 29.

In response to Defendants' statements, SDI's stock price increased, rising from a closing price of $10.24 on January 26, 2009, to a closing price of $13.08 on January 28, 2009. ¶ 30. When the stock priced reached this height, Bates began to sell shares of his SDI stock and, during an 11-day period beginning on January 29, 2009, he sold more than 2.5 million shares, reaping proceeds of $30,704,277. ¶ 30.

On February 27, 2009, SDI filed its 2008 10-K, signed by, *inter alia*, Bates and Busse. ¶ 31. In the discussion of operating results comparing 2008 with 2007, Defendants stated that SDI's inventories had been written down in Q4 2008 by $36 million because the market value of those inventories was below the cost of those inventories, and GAAP requires inventories to be stated at the lower of cost or market. ¶¶ 31, 32.

These statements were false and misleading at the time they were made because, throughout the Class Period, SDI was suffering diminishing demand for its products resulting in, *inter alia*, reduced orders and revenues and the overvaluation of inventories as market prices dropped below SDI's cost. ¶ 33. Specifically, Defendants failed to disclose that:

1) Demand for SDI's products, which had weakened significantly in Q4 2008, as Defendants admitted in the Q4 2008 Press Release and in the Q4 earnings conference call, showed continuing weakness in Q1 2009, as of the date of the Q4 2008 Press Release and Q4 earnings conference call. ¶ 34(a). In addition, Defendants knew that Heidtman Steel, owned by Bates, and other customers would not be increasing orders in Q1 2009 and would not be taking

5

delivery of SDI product in Q1 2009.  Thus, Defendants had no reasonable basis for believing that the adverse trend in demand for SDI products in Q4 2008 would be reversed in Q1 2009, ¶ 34(a);

2)  SDI's operations were running at less than 50% of capacity, ¶ 34(b);

3)  SDI's inventories were carried on SDI's financial statements at excessive values, higher than the lower of cost or market, and should have been written down by at least $70 million, ¶ 34(b) & (c); and,

4)  Given the continuing weakness in demand for SDI's products in Q1 2009, and in the absence of any existing facts to indicate or exhibit a reversal in that adverse trend, as well as the impaired value of inventories in SDI's Flat Roll Division, and the lack of increase in new orders from Heidtman Steel, coupled with delayed deliveries past Q1 2009, Defendants lacked a reasonable basis in fact for their earnings guidance for Q1 2009, ¶ 34(d).

On March 11, 2009, before the end of Q1 2009, SDI issued a press release in which it updated its outlook for Q1 2009 and disclosed the adverse facts which it had previously misrepresented. ¶ 35. In that Press Release, the Company stated: "[d]ue to **continued** weakness in market conditions, the company is reducing its first quarter estimate of earnings from $0.05 to $0.10 per diluted share, to a loss of $0.40 to $0.45 per diluted share." (emphasis added). ¶ 35. Defendants also stated that they would write down SDI's Flat Roll Division inventories by an estimated $70 million at the end of Q1 2009, which amount contributed significantly to the now-disclosed loss for Q1 2009.   ¶ 35. The Company also disclosed that its metals recycling operations were expected to report a loss for Q1 2009, as scrap prices **continued** to fall and recycled-metals shipping volumes were coming in much lower than projected. ¶ 35.

The market reacted very strongly to Defendants' belated disclosure of the truth of SDI's financial condition on March 11, 2009. ¶ 36.  The price of SDI's common stocked dropped 15%

to close at $7.25, on volume of more than 33 million shares, many times the average trading day volume for SDI common stock. ¶ 36. This was the biggest daily drop in SDI's common stock price since December 1, 2008. *Id.*

## III.    LEGAL STANDARDS

It is well-settled that "[t]he purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). A court must view the facts alleged in the complaint in the light most favorable to plaintiff, construe the allegations liberally, and draw any reasonable inferences from the facts in plaintiff's favor. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 594 (7th Cir. 2006) ("*Tellabs I*").

To state a claim for securities fraud under §10(b), one must plead that a defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied (6) that proximately caused plaintiff's injury. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).

A securities fraud claim must also satisfy Fed.R.Civ.P. 9(b), which provides that the circumstances constituting fraud shall be stated with particularity, *i.e.*, "the who, what, when, where and how." *Noller v. Grubbs*, 2005 U.S. Dist. LEXIS 15473, at *3 (S.D. Ind. Jul. 25, 2005); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). However, the PSLRA does not require the pleading of detailed evidentiary matters on a motion to dismiss. *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003).

To plead scienter, the complaint must "state with particularity the facts giving rise to a strong inference that defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). In the Seventh Circuit, the requisite state of mind is adequately pleaded by alleging facts which

7

demonstrate that **either** a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (*"Tellabs II"*).[2]  A court must consider the totality of the facts alleged to determine whether they give rise to "an inference of scienter *at least as likely* as any plausible opposing inference." *Id.* at 705 (emphasis in original), quoting *Tellabs I*, 127 S. Ct. 2499, 2513 (2007).

The Supreme Court held, in *Tellab I,* that the "strong inference" of scienter standard set forth in the PSLRA is met "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S.Ct. at 2510.  The Court cautioned that "courts must consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original).  Indeed, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 2511.  Under the "holistic" approach, each such fact must be given some weight, and all facts are evaluated together to determine whether the totality of the facts alleged gives rise to a strong inference of scienter.

In *Lewis v. Straka*, 535 Supp. 2d 926 (E.D. Wis. 2008), the court, applying the teachings of *Tellabs I,* stated, as follows:

> In *Tellabs*, the Supreme Court instructed courts how to determine whether allegations are adequate to give rise to such an inference.  I accept plaintiffs' allegations as true and consider the complaint in its entirety, such as documents attached to the complaint or those subject to judicial notice.  I then ask whether

---

[2]Recklessness is defined as "an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 600 (7th Cir. 2006) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977); *see also Tellabs II*, 513 F.3d at 704 (same).

the allegations taken collectively establish the "strong inference." In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiffs' claim. The inference favoring plaintiffs' claims "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences." Rather, plaintiffs' complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference once could draw from the facts alleged."

*Id*. at 928-929 (internal citations omitted).

## IV.  DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT SHOULD BE DENIED

### A.  The Complaint Alleges With Particularity Defendants' False and Misleading Statements Constituting Fraud

Under the PSLRA, a plaintiff is required to "specify each statement alleged to have been misleading," and explain "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). The Complaint satisfies these pleading requirements as it sufficiently alleges that Defendants made materially false and misleading statements about the demand for SDI's steel products and failed to disclose material information concerning the Company's orders, inventory levels and operating capacity, and the carrying value of SDI's inventories.

#### 1.  The Complaint Alleges the "Who, What, When and Where"

The Complaint specifies each statement alleged to be false or misleading as quoted above at pages 2-4 (¶¶25-31), when and where the statements were made (the 2008 Form 10-K, the Q4 2009 Press Release and the Q4 Earnings Conference call), as well as who the false or misleading statements are attributed to (SDI, Defendants Busse and Bates).

#### 2.  The Complaint Particularizes Reasons "Why" Defendants' Statements Were False or Misleading

The Complaint alleges "why" the statements were false or misleading by identifying specific facts that were not disclosed which rendered Defendants' statements materially false and misleading when made. ¶ 34(a) – (e). The law is clear that when corporate officers and directors

9

speak, they have an obligation to speak truthfully and cannot pick and choose from among the adverse facts only certain facts that they will disclose. "The disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re NeoPharm, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 1862, at *34 (N.D. Ill. Feb. 7, 2003). "If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

Although Defendants admitted that SDI was coming off the heels of the Company's "worst quarter" in Q4 2008 and that product orders had "dried up" due to weakened demand, ¶ 25, Defendants continued to represent that the Company "will return to profitability in the first quarter and remain profitable in 2009," even in the face of continued "lackluster demand for steel and scrap for several quarters." ¶ 26.   However, demand was not merely "lackluster," it was declining.  Heidtman Steel, the Company's largest customer, would not be increasing orders nor taking delivery of additional SDI product in Q1 2009. ¶ 34(a).   Additionally, information available throughout the steel industry supported the fact that the weak demand trend for steel products had not improved. For example, On January 26, 2009, Germany's ThyssenKrupp, one of the world's largest steel producers, announced that it was delaying the start-up of its stainless steel production at its new plant in Alabama for a year because of a "massive drop in demand" for stainless steel in North America. ¶ 33. Weakened demand at the OEM level also continued into the first quarter of 2009 and was acknowledged by Busse who stated on the Q4 2008 Earnings Conference Call that "automotive shutdowns that occurred in late December and have continued throughout the month of January." ¶ 28.

With respect to operating capacity, Busse stated that SDI will run the flat-rolled steel divisions "at about 60% in the first quarter," and that inventory levels at SDI were "really in

pretty good shape elsewhere throughout the company." ¶ 28, 29. However, the American Iron and Steel Institute, of which Busse was Chairman, released data reflecting that capacity utilization for U.S. steel producers was running at just 43% through mid-January 2009, contrary to Defendants' representations. ¶ 33.

Even though SDI's Q4 2008 Press Release announced that 2008 had been "the best year in the company's history," ¶¶ 25-26, in reality, SDI's had accumulated millions of dollars worth of excess inventory due to weakening demand and had overvalued its inventory in Q4 2008. ¶ 33. In that Press Release, Defendants claimed that one of the reasons for the record increase in SDI's 2008 net sales resulted primarily from significantly higher average selling prices for steel and recycled metals during 2008. ¶ 25. Just one month later, however, in the 2008 10-K, Defendants disclosed a $36 million write down of inventory, due to "a reduction in inventory values that were recorded at a cost level which was higher than current market values." ¶ 31.

These statements were false and misleading at the time they were made because throughout the Class Period, SDI suffered from diminishing demand for its products resulting in, *inter alia*, reduced orders and revenues and the overvaluation of inventories as market prices dropped and SDI was required to write down the value of its inventories to cost. ¶ 33, 34. The true facts concealed by Defendants during the Class Period also rendered their Q1 2009 projections false and misleading when made. ¶34; *Stransky*, 51 F.3d at 1331.

**B.    The Complaint Adequately Pleads Scienter**

For statements of present or historical fact, actual knowledge *or* recklessness suffices. *Tellabs II*, 513 F.3d at 704. Under the PSLRA, a plaintiff is not required to allege facts showing that Defendants **knew** the Q1 2009 earnings projection would not be achieved. Rather, the Complaint need only allege that Defendants knew of facts ***tending to undermine the***

11

*projections' reasonableness* – *i.e.*, that Defendants knew the projections lacked a reasonable basis. *See, e.g.*, *Sequel Capital, LLC v. Rothman*, 2003 U.S. Dist. LEXIS 20967, at *29 (N.D. Ill. Nov. 20, 2003) ("[A] plaintiff must allege 'specific facts which illustrate that [the] predictions lacked any reasonable basis.'") (quoting *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996)); *Trooien v. Mansour*, 2008 U.S. Dist. LEXIS 41307, at *16 (D. Minn. May 23, 2008) (Plaintiffs "need not show that [defendants] had *actual* knowledge that these specific revenue predictions were false at the time they were made," only that defendants "lacked a reasonable basis for any predictions of future revenue.") (emphasis in original). These are not allegations of fraud by hindsight. The Complaint demonstrates Defendants' contemporaneous knowledge of the falsity of the statements.

### 1. Defendants Were Knowledgeable About SDI's Core Operations to Support A Cogent Inference of Scienter

Courts have found that the core-operations inference can be a relevant part of a complaint that raises a strong inference of scienter. As Judge Hamilton declared, "[o]fficers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Schleicher v. Wendt*, 291 F. Supp. 2d 959, 976 (S.D. Ind. 2007) (citing *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003)). District Courts in this Circuit have repeatedly held that "facts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributable to the company and its key officers." *Danis v. USN Communications*, Inc., 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999); *In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188, 1196-97 (N.D. Ill. 2009); *Selbst v. McDonald's Corp.*, 2005 U.S. Dist. LEXIS 23093, at *61-*62 (N.D. Ill. Sept. 21, 2005) (holding "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a

company's performance.'"); *Sequel Capital, LLC v. Rothman*, 2003 U.S. Dist. LEXIS 20967, at *32-33 (N.D. Ill Nov. 20, 2003) (noting that "an inference may exist that officers and directors, by virtue of their positions with a company, could have knowledge of a company's deep financial difficulties."); *In re Westell Techs., Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 17867, at *37 (N.D. Ill. Oct. 26, 2001) (holding that a CFO's conduct raised a strong inference of scienter where he made positive statements about his company's financial results even though sales to its primary customer were falling); *Lindelow v. Hill*, 2001 U.S. Dist. LEXIS 10301, at *24 (N.D. Ill. July 20, 2001) (strong inference arose that "every officer or director" knew about problems affecting a company's core operations, or that a lack of such knowledge "equated to reckless disregards"); *Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 988 (N.D. Ill. 2001) (same).

In fact, "the closer a situation is to a business's core operations, the more reasonable it may be to infer that senior management is aware of the situation." *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 949 (S.D. Ind. 2005); *In re Shopko Sec. Litig.*, 2002 U.S. Dist. LEXIS 23887, at *30-*31 (E.D. Wis. Nov. 5, 2002). Because the alleged facts are obviously critical to SDI's core operations, knowledge of those facts may be attributed to Bates and Busse. *Danis*, 73 F. Supp. 2d at 938-39. "When the facts known to a person that place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs II*, 513 F.3d at 704. The Seventh Circuit explained corporate reality, as follows: "is it conceivable that he [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives at the company? It is conceivable, yes, but it is exceedingly unlikely." *Tellabs II*, 513 F.3d at 711; *Lewis*, 535 F. Supp. 2d at 931.

13

Where, as here, a corporation's "high-level officer" makes public statements that are contradicted by facts that are available when the statements are made, an inference arises that officer "had intimate knowledge of those facts or should have known of them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp.2d 474, 489 (S.D.N.Y. 2004). This is clearly "tantamount to conscious misbehavior sufficient to support a strong and cogent inference of scienter." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp.2d 370, 394(S.D.N.Y. 2004). Due to their positions and unique knowledge of SDI and steel demand, Busse and Bates knew that the statements made during the Class Period were false and misleading.

By virtue of their positions, Busse as CEO and board member of SDI and Bates as a non-independent director, Defendants attended Board Meetings, totaling eleven in 2008,[3] at which they reviewed, *inter alia*, drafts of public SEC filings, including Form 8-Ks which included SDI's press releases, including the Q4 2008 Press Release, which contain false and misleading statements, as alleged in the Complaint, ¶¶ 25-26, and participated in the making of the statements contained therein. Busse and Bates' high-level positions and their respective responsibilities and activities as CEO and director of SDI afforded them access to and made them responsible for development and reporting of the Company's projections. Busse and Bates signed SDI's 2008 10-K which contains false and misleading statements, as alleged in the Complaint. ¶ 31.

The Complaint alleges numerous facts which existed at the time Defendants made their statements and of which Defendants were aware. Bates and Busse were acutely aware that the challenging economic environment facing the steel industry and, specifically, the continuing weak demand during the Class Period for SDI's products. ¶ 33. Defendants' false and misleading

---

[3]Bates Ex. 3 (Proxy 2009 at 7).

14

statements that SDI "will return to profitability in the first quarter and remain profitable in 2009" in spite of "lackluster demand," ¶ 26 (Q4 2008 Press Release), and that SDI "should generate earnings in the first quarter in almost all of our steel divisions" regardless of the "fourth quarter climate," ¶ 27 (Q4 2008 Earnings Conference Call), omitted materially adverse facts.

As President and CEO of Heidtman Steel, SDI's largest customer, Bates knew that Heidtman Steel would not be increasing its orders for SDI products and would not be taking delivery in Q1 2009 of certain SDI products Heidtman Steel had previously ordered.[4] ¶ 34(a) and (d). As chairman of the American Iron and Steel Institute, Busse was aware of global steel demand. Due to their knowledge of weakening market demand, Busse and Bates also knew that SDI's flat-rolled division operating capacity would not exceed 50% despite Defendants' representations it would. ¶ 34(b); ¶ 29 ("we will run our flat-rolled divisions at about 60% in the first quarter" [of 2009]). Accordingly, there is an overwhelmingly strong basis for a finding that the allegations of the Complaint provide a cogent inference of Bates' scienter. Recently, *In re Ulta Salon, Cosmetics & Fragrance, Inc. Securities Litigation*, the Court, in denying defendants' motion to dismiss a Section 10(b) cause of action, reached the same conclusion in ruling that the allegations of scienter were sufficient, stating, as follows:

> There can be no question that defendants had access to this [inventory] information, . . . .Therefore there are allegations sufficient to support a strong inference that defendant either knew or intentionally avoided knowing that the Prospectus was misleading. This inference, that Kirby, President and CEO of Ulta, and Bodnar, the CFO, knew at the time that they signed the prospectus of the increase in the SG&A expenses, unwarranted increase inventory levels, and the problem with the software touted in the Prospectus, is cogent and at least as compelling as the inference defendants suggest: that they were essentially clueless as to the major problems existing with the company.

---

[4]Despite Defendant's attempt to minimize its importance, of the 400 customers of SDI's flat-rolled products, Heidtman Steel is the only one specifically mentioned by name in SDI's 2008 SEC Form 10-K. See Bates Ex. 1 (2008 10-K at 9).

604 F. Supp. 2d 1188, 1196-97 (N.D. Ill. 2009). *Accord, In re Motorola Sec. Litig.*, 2004 U.S. Dist. LEXIS 18250 at *92 (N.D. Ill. Sept. 10, 2004) (holding that defendants' "access to information contradicting their public statements" supports a finding that they "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." (internal quotes omitted). *In re Allied Prods. Corp.*, 2000 U.S. Dist. LEXIS 16781, at *15 (N.D. Ill. Nov. 15, 2000) (strong inference raised where products were a "critical part" of the company's business and defendants were apprised of production problems). This is particularly true where the alleged false and misleading statements relate directly to the business of SDI, including the nondisclosure of the following material facts: (1) SDI's inventory levels were high, (2) SDI was experiencing the cancellation and slowdown of orders and delays in delivery of existing orders, (3) lower selling prices for steel, (4) SDI's operations were running at less than 50% of capacity, and (5) the impact of the global recession on SDI's and Heidtman Steels businesses. ¶ 3.

The facts pleaded in the Complaint support the cogent inference that Bates and Busse knew or recklessly disregarded the material facts concerning continuing weakening demand for SDI's products in Q1 2009, the lack of significant orders from its largest customer, Heidtman Steel, and the impaired value of inventories in SDI's Flat Roll Division when the alleged false and misleading statements were made. The factual allegations in the Complaint are clearly sufficient to raise the possibility of relief above the "speculative level." *Knowles v. Hopson*, 2008 U.S. Dist. LEXIS 46106, at *5 (N.D. Ill. June 12, 2008).

### 2. Bates' Insider Trading in SDI Common Stock Further Supports A Cogent Inference of Scienter

Although motive is not required to prove scienter, *Schleicher v. Wendt*, 529 F. Supp.2d 959, 972 (S.D. Ind. 2007), motive and opportunity are useful indicators of a fraudulent state of

mind. *In re JP Morgan Chase & Co. Secs. Litig.*, 2007 U.S. Dist. LEXIS 93877, *24 (N.D. Ill. Dec. 18, 2007); *see also*, *Knowles v. Hopson*, 2008 U.S. Dist. LEXIS 46106 *9 (allegations of plaintiff's intended use of proceeds sufficient to satisfy scienter requirement under PSLRA").

In *Tellabs I*, the Supreme Court stated that "personal financial gain may weigh heavily in favor of scienter inference." 127 S.Ct. at 2511. "Allegations that a corporate insider delayed disclosing materially adverse information in order to sell personally-held stock at a huge profit can supply the requisite motive for a scienter allegation." *In re Westell*, 2001 U.S. Dist. LEXIS 17867, at *34-35. The Seventh Circuit clearly recognizes that insider selling can support a cogent inference of scienter and has not expressly adopted any bright line test. *See Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 978 n.10 (N.D. Ill. 2006) (noting that "with regard to stock sales as evidence of scienter, the Seventh Circuit refused to hold that one percent of a defendant's stock was per se too little," citing *Tellabs*, 437 F.3d at 604). *See also In re System Software Assocs. Sec. Litig.*, 2000 U.S. Dist. LEXIS 3071, at *43 (N.D. Ill. Mar. 8, 2000) (holding that "the inference is obviously strongest when examined collectively – e.g. where the individual defendants bought or sold shares in a common pattern.").

Armed with his knowledge of the true undisclosed facts, Bates then took advantage of his unique position and sold more than 2.5 million shares of his SDI stock in an 11-day period during the Class Period before those true facts were disclosed to the market. With knowledge of the undisclosed materially adverse facts, Bates embarked on a selling spree of his personal holdings of SDI common stock, which sales he made without first disclosing these adverse material facts known to him and withheld from the market, which permitted him to engage in unusual insider selling of over 2.5 million shares to realize proceeds in excess of $30 million. ¶ 34(e). "[S]uch a large selloff arguably would be unusual where defendants are publicly

indicating that prospects of the company are improving." *In re Spyglass, Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 11382, at *20 (N.D. Ill. July 20, 1999) (observing that "[i]f defendants sincerely believed such statements, they would be motivated to hold the stock, not sell it.").

The Complaint alleges that during the entire Class Period, Bates was aware of the Company's false and misleading statements, all of which put SDI in a positive financial light, he was receiving information about the Company, which told a different story, and chose to sell, over 2.5 million SDI shares in an 11-day period at inflated prices. ¶ 2. Allegations that Bates sold substantial portions of his holdings "in a very short period of time" while "stock was trading at all-time highs, give rise to a strong inference of scienter." *In re Tut Sys. Sec. Litig.*, 2002 U.S. Dist. LEXIS 27092, at *39 (N.D. Cal. Aug. 15, 2002).

The Complaint also alleges facts which establish the context in which Bates chose to dump his stock.  After the release of the Company's reported results on January 26, 2009, SDI's stock price increased from a close on January 26, 2009 of $10.24 to a close on January 27, 2009 at $11.78 and a close on January 28, 2009 of $13.08. ¶ 30. Three days later, beginning on January 29, 2009 and continuing through February 9, 2009, defendant Bates sold over 2.5 million shares for proceeds of over $30,704,277.00. ¶¶ 2, 11.B., 30.  Bates' stock sales were unusual and suspicious because they were made shortly after defendants made positive false statements concerning SDI's business.  "[W]here stock sales occurred on the heels of optimistic statements, this constitutes circumstantial evidence that statements were fraudulent when made." *Schlagel v. Learning Tree Int'l*, 1998 U.S. Dist. LEXIS 20306, at *32 (C.D. Cal. Dec. 29, 1998); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (holding that timing of stock sales, which occurred shortly after management made optimistic statements to the market, "makes them suspicious"); *Hayley v. Parker*, 2001 U.S. Dist. LEXIS 23255, at

*16-*17 (C.D. Cal. Aug. 31, 2001) (holding that stock sales that "occurred within days of quarterly reports which reflected the alleged fraudulent earnings statements" give rise to a strong inference of scienter).

These circumstances further support a cogent inference of scienter. *See Tellabs I*, 127 S. Ct. at 2511 ("allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint"); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005) (finding scienter based on "allegations of motive in combination with other allegations of defendants' intent to mislead or deliberate recklessness.").

Bates' suggestion that he could have sold more SDI stock but retained additional shares does not negate the inference of scienter from his stock sales. The law does not require that an insider sell all or even a specific percentage of his holdings in order to trigger the inference. There is no such bright line test. Here the timing and amount of Bates' sales were, for purposes of the motion to dismiss, suspicious. In *Takara*, 429 F. Supp. 2d at 981, the court stated that "the fact that stock sales only amounted to 1.9% of [defendants'] holdings does not negate the possibility that [defendants] sold the shares to avoid losses upon disclosure of adverse information." [5]

---

[5] Bates incorrectly argues that when executives, such as Busse and other directors and/or officers, do not trade during the class period, any inference of scienter is negated. However, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) ("we have never held that the absence of insider trading defeats an inference of scienter"); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1247 n.6 (N.D. Cal. 2008) ("the fact that there was no sale of stock does not cut in defendants' favor"). Furthermore, even though the Seventh Circuit in *Higginbotham v. Baxter Int'l, Inc.* recognized that an absence of sales could lead to one possible inference that

### 3. Scienter Can Be Imputed to SDI

As a corporation, SDI's scienter is established base on the cumulative knowledge of SDI's employees, as well as the collective "intentional" practices of the Corporation, which are imputed to SDI. A corporate defendant can have scienter regardless of the state of mind of any individual employee or agent. *See, e.g., In re Worldcom, Inc. Sec. Litig.*, 352 F.Supp. 2d 472, 497 (S.D.N.Y. 2005) (holding that "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient."); *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. June 26, 2008).

This Circuit has recognized the validity of the corporate scienter theory.[6] *Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995)("there are conceivable situations where the individual actors would not be liable but their corporate employer would be, for example where a case depends on the collective scienter of its employees or where defenses are available to

---

"nothing was thought to be out of the ordinary in April 2004," it did not hold that "[t]he absence of any trading by the only defendants who were senior officers 'means that the complaint lacks the required "strong" demonstration of scienter.'" 495 F.3d 753, 759 (7th Cir. 2007).

[6] Similarly, the First, Second, and Ninth Circuits have given increasing credence to the corporate scienter theory. *See also, Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d. Cir. 2008) (holding that it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (while not specifically addressing corporate scienter, the court stated that "[m]ost of the potentially actionable statements in the complaint, including the SEC filings and the press releases, were company documents."); *Nordstrom, Inc. v. Chubb & Son, Ins.*, 54 F.3d 1424, 1435 (9th Cir. 19095) ("in litigation involving Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5, even through a corporation is incapable of acting except through individual directors and officers, the cumulative knowledge of its directors and officers is imputed to it. . . . [A] corporation's knowledge need not be possessed by a single officer or agent, the cumulative knowledge of all its agents will be imputed to the corporation.").

individuals but not the corporation."). Recently, the Seventh Circuit held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor II*, 513 F.3d at 710. The Court also found the inference of corporate scienter to be cogent, stating that "[b]ecause the alternative hypotheses – either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements – are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent." *Id.* at 711.

To establish corporate liability for a violation of Rule 10b-5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Makor II*, 513 F.3d at 708 citing, *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 366 (5th Cir. 2004) (footnote omitted). A corporation is liable for statements by employees who have apparent authority to make them. *Id*. There can be no dispute that Busse and Bates had apparent authority to make statements for SDI. Hence, the strong inference of scienter plead in the Complaint can be imputed to SDI.

C.   **The Complaint Adequately Alleges False And Misleading Statements Attributable To Bates[7]**

1.   **Bates Is Liable for the Statements in SDI's 2008 10-K Because He Signed The Document**

Bates signed the 2008 10-K which, Plaintiffs allege, contains false and misleading statements. ¶ 31. Bates does not dispute that he signed this SEC filing. Thus, as a matter of law, he is liable for the misleading statements contained in the 2008 10-K. *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004); *In re Cabletron Systems, Inc.*, 311 F.3d 11, 41 (1st Cir. 2002); *In re Motorola Sec. Litig.*, 2004 U.S. Dist. LEXIS 18250, at *760-77 (N.D. Ill. Sept. 10, 2004) ("corporate officers who sign fraudulent SEC filings with the requisite level of scienter can be liable as violators of section 10(b) for making false statements"). As explained in *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000), where outside directors were held responsible for SEC filings they signed, there are three bases upon which a person who executes an SEC filing with material representations or omission may be held liable as a primary violator of Section 10(b):

> First, when a corporate officer signs a document on behalf of a corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true…Second…signers of documents should be held responsible for the statements in the document…Third, by placing responsibility on the corporate officers to ensure the validity of corporate filings, investors are further protected from misleading information…By standing behind a statement, the public assumes that they can trust the word of the maker of that statement.

*Id.* at 1062. To hold otherwise, the *Everex* court cautioned, would eviscerate investors' ability to seek redress:

> Key corporate officers should not be allowed to make important false financial statements knowingly and recklessly, yet still shield themselves from liability to

---

[7] Bates argues that he is not responsible for the statements alleged to be false and misleading. Defendant Busse, however, asserts no such argument.

investors simply by failing to be involved in the preparation of those statements. Otherwise, securities laws would be significantly weakened, because corporate officers could stay out of the loop such that, under *Central Bank*, only the SEC could bring suit against them in an individual capacity for their representations.

*Id.*

Bates specifically argues, not that he is not liable for the misstatements in the Form 10-K because he signed the document, but rather that he is just not liable to Plaintiffs. *See* Bates Brief at 7-9. The basis for his argument is the fact that neither of the Plaintiffs bought SDI stock after the date of the 2008 10-K which Bates signed. Bates then argues that neither of the Plaintiffs has standing to pursue a claim based on the false and misleading 2008 10-K. *See* Bates Brief at 8.

The great weight of the law rejects Bates' position. Where fraud is ongoing and alleged to be part of a common scheme, (¶¶ 16, 40, 43), the Seventh Circuit has permitted plaintiffs to represent the entire class. *See, e.g., Payton v. County of Kane*, 308 F.3d 673, 678-79 (7th Cir. 2002) (adopting the Ninth Circuit's *La Mar v. H & B Novelty Loan Co.*, 489 F.2d 461 (9th Cir. 1973), wherein the court held that if the plaintiffs as a group – named and unnamed – have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise, "juridically related in a manner that suggests a single resolution of the dispute would be expeditious," the claim could go forward. *Id.* at 679; *see also Weiss v. Winner's Circle*, 1995 U.S. Dist. LEXIS 18713, at *4-5(N.D. Ill. Dec. 14, 2995) (standing exists where injuries are the "result of a conspiracy or concerted schemes between the defendant at whose hands the class suffered injury"). As one court put it, "[t]here would be little sense in cutting off the class period on the day plaintiff happened to buy since the thrust of plaintiffs' action is that [defendants'] public statements over a period of time...constituted fraud on the market." *Walsh v. Chittenden Corp.*, 798 F. Supp. 1043, 1055 (D. Vt. 1992). Thus, "[a] class

representative has standing to represent all investors similarly defrauded by the alleged scheme, regardless of the representative's date of purchase." *Id.*

Indeed, "numerous courts have stated that class representatives do have standing to assert claims under § 10(b) which arise from statements made after the class representative purchased shares as long as the statements allegedly were made in furtherance of a common scheme to defraud." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13 (D. Mass. 2004) (citing *Upton v. McKerrow*, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995) (citing numerous cases)). Therefore, Plaintiffs have responsibility to prove losses for the entire Class, regardless of their in-Class purchase date.

Bates' citation to *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992),[8] a pre-PSLRA case, is misplaced. *Roots* involved a plaintiff who bought Lands' End stock after the allegedly withheld information was already in the market. The issue there was not whether plaintiff had standing but rather the fact that plaintiff had "fail[ed] to allege loss causation." *Id.*  Bates makes no argument here concerning plaintiffs' allegations of loss causation.  In fact, if Bates' reading of *Roots* were to prevail, individual issues would predominate at class certification, thereby making a class action impossible in *any* securities class action. This argument has been repeatedly rejected in fraud-on-the-market cases. *See, e.g., Schleicher v. Wendt*, 2009 U.S. Dist. LEXIS 24810, at *11 (S.D. Ind. March 20, 2009); *Scholes v. Stone, McGuire and Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992); *see also In re Scott*

---

[8] Plaintiffs unquestionably have, and Bates does not deny that Plaintiffs have standing to bring the causes of action alleged in the Complaint. Plaintiffs have "suffered actual injuries related to defendants' alleged actions, and therefore has individual standing to sue defendants." *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008). Standing contains three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) there must be a causal connection between the injury and the conduct complained of; and, (3) it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

*Paper Co. Sec. Litig.*, 142 F.R.D. 611, 615 (E.D. Pa. 1992); *Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598, 606 (N.D. Cal. 1991); *Walsh v. Chittenden Corp.*, 798 F. Supp. 1043, 1055 (D. Vt. 1992).

In the class action context, the court need only find that "Lead Plaintiffs satisfy threshold individual standing." *In re VeriSign, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 10439, at *17 (N.D. Cal. Jan. 13, 2005) (denying summary judgment and rejecting argument that lead plaintiff lacked "standing" to base claims upon any misrepresentations made by defendants after date of their last stock purchase);[9] *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008) (finding standing adequately pled at motion to dismiss stage). Here, Plaintiffs have alleged that Defendants made all misrepresentations and omissions at issue as part of an ongoing scheme to defraud investors, ¶¶ 14, 40, 43, and will have the same interest in, and responsibility for, proving losses suffered by the entire class. ¶¶ 17-22. This interest satisfies the case or controversy requirement and confers standing to pursue their claims.[10] "Once the class representatives individually satisfy standing, that is it; standing exists." *Id.* at *15. Plaintiffs each bought SDI stock during the Class Period at artificially inflated prices **after** the initial false and misleading statements were disseminated, ¶¶ 25-29.[11] Because the 2008 10-K was disseminated during the Class Period, albeit after the Plaintiffs purchased their stock, Plaintiffs still have standing to allege that the 2008 Form 10-K was false and misleading. To hold

---

[9] "Whether the class representatives may *then* represent the claims of the class is a separate inquiry" that is governed by Fed.R.Civ.P. 23. *In re VeriSign*, 2005 U.S. Dist. LEXIS 10439, at *16. (emphasis in original).

[10] If the Court accepts Defendants' argument that *Roots* somehow limits the standing of the Lead Plaintiffs, Plaintiffs request leave to amend the Complaint to join an additional plaintiff or plaintiffs who purchased at later dates in the Class Period.

[11] The January 26, 2009 Q4 2008 Press Release and the January 27, 2009 Q4 2008 Earnings Conference Call.

otherwise, would lead to the absurd result that would require that a plaintiff purchase virtually every day during a class period in which there was a continuing course of wrongful conduct. "[W]ere the rule otherwise, there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since each day the mix of information available to the public would vary." *Feldman v. Motorola, Inc.*, 1993 U.S. Dist. LEXIS 14631, at *17 (N.D. Ill. Oct. 14, 1993); *see also In re General Instrument Corp. Sec. Litig.*, 1999 U.S. Dist. LEXIS 18182, at *11-12 (N.D. Ill. Nov. 15, 1999) ("the only way to completely avoid the potential for conflict would be to certify different classes for each day of the class period"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 727-28 (D. Del. 2000) (same).

Bates' additional reliance on *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913 (S.D. Ind. 2008), is also misplaced. There the Court made the statement in dicta, relying on its reading of *Roots,* that a plaintiff cannot pursue a false statement that was made after his date of purchase. *Id.* at 926. This view is out of step with the great weight of authority of cases that have actually ruled on the issue, a ruling which the Court in *Guidant* specifically declined to make. *Id.* (declining to address plaintiff's standing since dismissal of complaint supported by other grounds). The better view is that as long as the plaintiff has standing to bring the cause of action involving a continuing course of common conduct, he does not have to have purchased after the date of each false and misleading statement alleged to have been made during the class period. [12]

---

[12]Furthermore, the additional cases relied upon by Bates to support his standing argument are factually distinguishable. *See, e.g., In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 112 (N.D. Ill. 1996) (granting plaintiffs' motion for class certification but denying request to extend class period); *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 719 (N.D. Ill. 2005) (motion to dismiss supported by specific finding that corporate plaintiff's 10(b) claim was based on purchase of securities almost three years prior to alleged misrepresentations made by defendants); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 707 (N.D. Ill. 2005) (granting motion to

2.    **Bates is Liable for the False and Misleading Statements made in the Press Release**

SDI's Q4 2008 Press Release was filed with the SEC in SDI's Form 8-K. As a "non-independent director," Bates would have reviewed both the press release and Form 8-K. ¶ 15. As SDI proudly touts in its SEC filings, Bates is a key person on the Board because of his "in-depth knowledge of the Company, its history, its strengths and weaknesses, and its goals and objectives." ¶ 11.B. Bates attended the Board meetings[13] and it is routine practice for earnings press releases to be circulated at Board meetings. Despite his arguments to the contrary, Bates is legally responsible for the Q4 2008 Press Release. Otherwise, no one would be responsible for the statements made in the press releases of companies because no one signs the press releases. In *McConville v. SEC*, 465 F. 3d 780, 787 (7th Cir. 2006), the Seventh Circuit held that a corporate officer can be liable despite having made *no* public statements where the officer reviewed the company's statements, reviewed and approved the document containing those statements and sent a letter to the company's auditor concerning the statements). The court reiterated its rejection of the "literal interpretation" of Rule 10b-5 in "holding that 'actual or first-hand contact with offerees or buyers (is not) a condition precedent to primary liability for antifraud violations,' so long as the requisite intent was established." *Id.*

Liability may be imposed "on those who had knowledge of the fraud and assisted in its preparation." *S.E.C. v. First New Jersey Secs., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996). As an SDI director, Bates, like Busse, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, and projections. ¶ 44. As a co-founder and

---

dismiss and limiting analysis to allegedly fraudulent statements made by defendants only up through date of single plaintiff's stock purchase).

[13]Bates Ex. 3 (Proxy 2009 at 7) (total of eleven Board meetings in 2008).

the largest individual shareholder of SDI, Bates also enjoyed significant personal contact and familiarity with Busse, the Company's other co-founder, and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances and operations at all relevant times during the Class Period.  ¶ 44. Bates not only executed the 2008 10-K with Busse that contained false and misleading information, but he also failed to correct the false and misleading statements regarding SDI's inventory levels, steel operations and shipments, and financial results during the Class Period in the Q4 2008 Press Release, which was attached to SDI's SEC Form 8-K dated December 15, 2008. "An individual is liable for a false statement where he makes, substantially participates in making, or is intricately involved in making the statement." *Middlesex Retirement System v. Qwest Software, Inc.*, 2008 U.S. Dist. LEXIS 68419, at *27 (C.D. Cal. July 10, 2008).

In this instance, the false and misleading statements in the Press Release can be attributed to Bates as it disseminated false and misleading earnings guidance for Q1 2009. *See In re Global Crossings, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004) (Rule 10b-5 liability exists if non-speaking defendants committed manipulative or deceptive acts in furtherance of an alleged scheme to defraud).

### 3.     Bates is Liable For the False and Misleading Statements Made During the January 27, 2009 Earnings Conference Call

Although Bates did not verbally participate in the Earnings Conference Call, as a non-independent director of SDI, a publicly-held company whose common stock is registered with the SEC pursuant to Section 12 of the Exchange Act and traded on the NASDAQ, he has a duty to promptly disseminate accurate, complete and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings and present and future business prospects that would be material to

28

investors.  *See* ¶¶ 14, 42; SEC Regulation S-X[14] and SEC Regulation S-K.[15]  Therefore, Bates had a duty to correct any previously-issued statements, through the Conference Call or otherwise, that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information. ¶ 14.

Here, Bates failed to correct the false and misleading statements disseminated in the Conference Call which Defendants acknowledge are publicly available through the Company's website. *See* SDI/Busse Brief at 5 n.7.  "Where it is pled that one defendant knowingly uttered a false statement and that the other knowingly failed to correct it, even if it is not alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant."  *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) (holding company official cannot knowingly fail to correct a false oral statement made by another official).

**D.     Defendants' Projections Are Not Protected by the PSLRA's Safe
Harbor Provision**

Dismissal on the pleadings under the safe harbor defense "requires a stringent showing" by defendants.  The PSLRA's safe harbor provision applies only to statements "identified" as "forward-looking" and "accompanied by meaningful cautionary" language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A).  Courts in this Circuit have repeatedly held that

---

[14]17 C.F.R. Sections 210.1-01 *et seq.*(Application of Regulation S-X; form and content of and requirements for financial statements required to be filed under the Securities Exchange Act of 1934).

[15]17 C.F.R. Sections 229.10 *et seq.* (General; standard instructions for Filing Forms under the Securities Exchange Act of 1934).

determining what constitutes "meaningful cautionary language" is "difficult if not impossible" to decipher, particularly "at the pleading stage, before plaintiffs have access to discovery." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004); *Blatt v. Corn Prods. Int'l*, 2006 U.S. Dist. LEXIS 39383, at *16-*18 (N.D. Ill. June 14, 2006) (holding that the sufficiency of cautionary language may present a question of fact or law that cannot be determined on a motion to dismiss); *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *48-*57; *Ong   v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 905(N.D. Ill. 2004); *Walton Risk Servs. v. Clarendon Am. Ins. Co.*, 2002 U.S. Dist. LEXIS 20650, at *19-*21 (N.D. Ill. Oct. 25, 2002). Here, application of the PSLRA's safe harbor provision "is not so obvious as to be decided as a matter of law." *EP MedSystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 877 (3d Cir. 2000).

### 1.   The Safe Harbor Provision Does Not Apply to Defendants' Misstatements of Current or Historical Facts

Defendants' assert that the alleged statements regarding SDI's Q1 2009 earnings guidance were forward-looking and hence subject to protection from liability under the safe harbor provision.   The statements alleged are not forward-looking at all but rather are statements of *past* or *present* fact that are excepted from such protection.  *See Takara*, 429 F. Supp. 2d at 974 (N.D. Ill. 2006) (safe harbor did not apply to statements regarding company's ability to absorb raw material costs because they referred to past, not future, performance").

The Complaint alleges that Defendants *failed to disclose* material adverse facts affecting: (1) demand for SDI's products; (2) SDI's inventory levels and operating capacity; (2) orders and shipments for SDI products, (3) selling prices for SDI steel; and (5) the impact of the global recession on SDI's and Heidtman Steel's businesses.   *See Id.* (holding that "it is axiomatic that the failure to make a statement cannot be forward-looking").

## 2. General Cautionary Language Does Not Insulate Misleading Projections

Defendants argue that their Class Period statements regarding SDI were couched in sufficient "meaningful cautionary statements" that precludes liability. Defendants point to the following purported cautionary statements:

- That SDI was subject to cyclical changes in market supply and demand for steel as well as "general economic conditions affecting steel consumption."

- That SDI was exposed to risks associated with the current financial crisis

- That there was the risk of a "prolonged recession"

- That the steel industry was impacted by the worldwide economic downturn as well as the tightening global capital and credit markets.

*See* SDI/Busse Brief at 11-12. Defendants' risk disclosures, however, were not "tailored to the risks that accompany the particular projections" for Q1 2009. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *Ong*, 388 F. Supp. 2d at 904-05 (N.D. Ill. 2004) (holding that "[a] warning that trends could change" was too general to adequately warn against the alleged risk). Such generalized risks and warnings could apply to every steel company. Here, however, serious omissions were made by Defendants with respect to facts that directly impacted SDI's inventory and earnings. ¶ 34.

Furthermore, this cautionary language says nothing substantive or specific about SDI. *See Cent. Laborers' Pension Fund v. Sirva, Inc.*, 2006 U.S. Dist. LEXIS 73375, at *59-*67 (N.D. Ill. Sept. 22, 2006) (statement that "[a]ny difficulties with our information systems or our information systems providers could delay or disrupt our ability to service our customers and impair our competitiveness" was insufficient to warn against the alleged risk). Meaningful cautionary language must constitute "'substantive' company-specific warnings." *Lormand v. US*

31

*Unwired, Inc.*, 565 F.3d 228, 244-245(5th Cir. 2009). To the extent that the warnings disclosed some risks, they made no mention of the actual, known risks which already materialized – *i.e.*, that Heidtman Steel would not be increasing orders or taking delivery of additional SDI products in Q1 2009 to reverse the weak demand; that SDI's operations were running at less than 50% of capacity; and that SDI's inventories were at excessive levels and were recorded at cost levels higher than current market values. ¶ 34. *In re 21st Century Holding Co. Secs. Litig.*, 2008 U.S. Dist. LEXIS 108196, at *35-36 (S.D. Fla. Nov. 7, 2008); *Lormand,* 565 F.3d at 245-48, *Berson v. Applied Signal Technology, Inc.*, 527 F. 3d 982, 987(9th Cir. June 5, 2008) (stating that "[i]t goes without saying" that investors would appreciate, and find material, the difference between a "risk" and a "certainty").

Defendants' risk disclosures are merely boilerplate. The Seventh Circuit defined the term "boilerplate" as "'language which is used commonly in documents having a *definite* meaning in the same context without variation.'" *United States v. Ataya*, 864 F.2d 1324, 1333 (7th Cir. 1988) (emphasis in original). Indeed, in *Asher*, the Seventh Circuit reversed a dismissal based upon the safe harbor provision where "the cautionary language remained fixed even as the risks changed." 377 F.3d at 734. Disclaimers that SDI was subject to cyclical changes in market supply and demand for steel as well as "general economic conditions affecting steel consumption," is classic boilerplate because such changes constitute "factors that are so broad that they apply to *any* business that sells products to consumers." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (emphasis in original); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 708-10 (3d Cir. 1996); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 251-52(D. Mass 2006); *In re Splash Tech. Holdings Sec. Litig.*, 2000 U.S. Dist. LEXIS 15369, at

*32-*33 (N.D. Cal. Sept. 29, 2000); *Ruskin v. TIG Holdings, Inc.*, 2000 U.S. Dist. LEXIS 11517, at *16-*20 (S.D.N.Y. Aug. 14, 2000).

Moreover, simply mixing a present statement of fact with a future projection will not insulate the entire statement. *In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *56 n.11 (E.D. Pa. Aug. 23, 2002) ("Defendants cannot convert a larger statement containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking"); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) ("Linking future success to present and past performance does not render statements immune from liability"). Stating in the Press Release and Earnings Conference Call that "we are optimistic" and that Defendants' guidance was a "very preliminary estimate" for Q1 2009, does not warrant protection as forward-looking. Defendants' cautions were interspersed with facts they knew were false and misleading about SDI. Defendants continued to represent that the Company "will return to profitability in the first quarter and remain profitable in 2009," ¶ 26, even though its largest customer, Heidtman Steel, would not be increasing orders that quarter. ¶ 34(a). Contrary to Defendants' representations that SDI would be running at over 50% capacity in the first quarter, the American Iron and Steel Institute, of which Busse was Chairman, released data reflecting that capacity utilization for U.S. steel producers was running at just 43% through mid-January 2009. ¶¶ 11.A., 29, 33.

### 3. The Safe Harbor Provision Is Inapplicable Because Defendants Had Actual Knowledge of the Falsity of Their Statements

#### a. Defendants' Projections Lacked a Reasonable Basis

The safe harbor provision is inapplicable where, as here, Plaintiffs adequately allege that Defendants actually knew that their statements were false or misleading. *Tellabs II*, 513 F.3d at

705; 15 U.S.C. §78u-5(c)(1)(B); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007). A projection is actionable as false or misleading if it is "made without a reasonable basis or disclosed other than in good faith." *In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009); *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *31 (N.D. Ill. Sept. 21, 2005) (projections found misleading and made in bad faith where defendants "ignored facts that seriously undermined the accuracy of the Projections"). As demonstrated herein, the Complaint alleges that Defendants failed to disclose that SDI suffered from diminishing demand for its products resulting in, *inter alia*, reduced orders and revenues and the overvaluation of inventories as market prices dropped and SDI was required to write down the value of its inventories to cost. ¶¶ 33, 34.

### E.    The Complaint Adequately Pleads Loss Causation

The Amended Complaint particularizes the misrepresentations and omissions Defendants made on January 27, 2009 (¶¶ 25-34), the true facts which were revealed on March 11, 2009 (¶¶ 35-37) and the precise market reaction to the disclosure of the truth -- *i.e.,* a stock drop of $1.30 per share, or 15%, on extraordinarily large volume of 33 million shares (¶ 36). The Class Period begins on January 27, 2009, when Defendants made their false and misleading statements to the market which inflated the market price of SDI common stock on March 11, 2009, when defendants disclosed the true facts and the market price of SDI's common stock plummeted.

These allegations more than suffice to establish loss causation at the pleading stage under both *Dura Pharmaceuticals, Inc. v. Broudo* , 544 U.S. 336 (2005), and *Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 993 (7th Cir. 2007). In *Dura,* the Supreme Court stated that plaintiffs in securities cases should provide, under Fed. R. Civ. P. 8(a), nothing more than a short and plain statement containing "some indication of the loss and the causal connection that the plaintiff has

in mind." *Id.* at 347. This standard is "not meant to impose a great burden upon the plaintiff." *Id.* at 346. In *Ray*, the Seventh Circuit ruled that in a fraud-on-the-market case (such as the one at bar), loss causation is adequately alleged by pleading: (a) "that the defendants' alleged misrepresentations artificially inflated the price of the stock;" and (b) "that the value of the stock declined once the market learned of the deception." 482 F.3d at 995. This is precisely what the Complaint alleges here.

Subsequent to *Dura* and *Ray*, courts within this Circuit have repeatedly upheld complaints with loss causation allegations similar to those at bar. *See e.g., Norfolk County Ret. Sys. v. Ustian,* 2009 U.S. Dist. LEXIS 65731, at *20-21 (N.D. Ill. July 28, 2009)(loss causation properly pled where plaintiff set forth material misstatements, and alleged that upon revelation of bad news there was a "reaction in the marketplace that resulted in the reduction in share price."); *In re Northfield Labs., Inc. Secs. Litig.,* 2008 U.S. Dist. LEXIS 76804 (N.D. Ill. Sept. 23, 2008) ("Plaintiffs have alleged that the truth was revealed in a UBS analyst's report and that the price of Northfield shares dropped as a result of the disclosures. Accordingly, plaintiffs have adequately alleged loss causation with respect to these statements."); *In re Bally Total Fitness Sec. Litig.,* 2006 U.S. Dist. LEXIS 93986, at *43-44 (N.D. Ill. July 12, 2006)(*Dura* satisfied where, citing an adverse announcement, plaintiffs alleged that the stock "fell precipitously" and "as a result, plaintiffs suffered economic loss."). *See also, Schleicher v. Wendt,* 529 F. Supp. 2d 959, 966 (S.D. Ind. 2007)("The typical PSLRA plaintiff shows loss causation by first showing that a company's stock price was artificially inflated when fraudulently rosy information was released to the public, and by then showing that a drop in the stock price followed shortly after the truthful bad news was released to the market.").

Defendants are wrong in asserting that Plaintiffs are required at the pleading stage to

analyze and explain every twist and turn in the stock price during the Class Period, or advances in the stock price due to news or market conditions that occurred subsequent to the close of the Class Period. This precise argument has been heard and rejected many times. Debates as to the whys and wherefores of stock price movements on particular dates before or after the termination of the Class Period, or as to how every utterance made on the date the Class Period ends may have affected the price, are fact-sensitive, often the subject of expert testimony and must await resolution at the summary judgment or trial stage. In *Silverman v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 76799 (N.D. Ill. Sept. 23, 2008), the court stated:

> We believe that the defendants read the loss causation requirement too narrowly. The possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists. There is no requirement at the pleading stage that a plaintiff affirmatively rule out those other factors in its complaint; rather that burden arises at trial.

*Accord, Schleicher v. Wendt,* 529 F. Supp. 2d at 968 (upholding loss causation allegations even where there was no date upon which the fraud was starkly exposed and the price declined, noting that loss causation need not be pled with particularity, and stating that plaintiffs need not at the pleading stage analyze and explain the "many" factors which affected the share price during the Class Period); *In re Hollinger Int'l, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 47173, at *45 (N.D. Ill. June 28, 2006)("At the motion to dismiss stage, this Court will not resolve factual disputes regarding the nature or timing of the disclosures, or their effect on the market."). *See also, Lormand,* 565 F.3d 228, 267 n.33 (5th Cir. 2009)("The defendants also argue that the plaintiff's SAC fails to plead loss causation because one disclosure was followed immediately by a stock price increase rather than a decrease. This argument deals with the actual timing of the loss, and not whether the plaintiff pleaded a plausible causal relationship between the defendants' fraud and the plaintiff's economic loss...The actual timing issue is a factual question, and is not enough

to dismiss a complaint that alleges a specific causal link, as is the case here, under Rule 12(b)(6).").[16]

### F.    The Complaint Sufficiently Alleges Control Person Liability

As demonstrated above, the Complaint successfully pleads a primary violation of Section 10(b) and adequately alleges Busse and Bates' control over SDI for purposes of Section 20(a). *Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 543 (7th Cir. 2005); *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1138-39 (7th Cir. 1992).

As co-founder and CEO of SDI since 1993, Busse not only signed SEC filings but was the principal spokesperson for the Company.  ¶¶ 11.A., 26, 27, 28, 29, 31.  Due to his unique dual position as co-founder and outside director of SDI, as well as President and CEO of Heidtman Steel, ¶¶ 10, 11.B; Bates Ex. 3 (Proxy 2009 at 14), Bates knew that the business decisions he made as CEO of Heidtman Steel with respect to the amount of product it would be purchasing from SDI and the timing of those orders and deliveries significantly influenced and affected SDI's inventory levels, product shipments, internal forecasts and business plans, and financial results. ¶¶ 10, 11.B; Bates Ex. 3 (2009 Proxy at 14). [17]   Busse and Bates clearly knew

---

[16] Defendants' reliance on *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) is misplaced.  There, the court found that loss causation was not properly pled because the facts disclosed on the date the stock price dropped had previously been made public or had nothing at all to do with the alleged fraud.  *Id.* at 186-87.  The case at bar could not be more different. Likewise, *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 (2d Cir. 2005) is inapposite because (unlike here) there was simply "no allegation that the market reacted negatively to a corrective disclosure...."  Finally, in *Cellular Tech. Servs. Co. v. TruePosition, Inc.,* 609 F. Supp. 2d 223, 246 (D. Conn. 2009), which was not an open-market fraud case, the court found that the allegations as to how an alleged fraud lulled plaintiff into failing to seek an injunctions, and how that injunction would have saved plaintiff money did not plead loss causation.

[17] Thus, regardless of whether Bates is found to have made the alleged misstatements in SDI's Q4 2008 Press Release and Q4 2008 Earnings Conference Call, Bates is still liable as a control person and cannot be dismissed from the litigation.

of, *inter alia*, SDI's inventory levels, sales and shipments, internal forecasts and business plans and financial results prior to and during the Class Period.

The Complaint alleges that due to their unique positions and intimate knowledge of the Company's finances, Busse and Bates had the power to influence and control and did influence and control the decision-making of the Company, including the content of the various SEC filings, press releases and other public statements pertaining to SDI's financial condition during the Class Period. ¶¶ 15, 53. As member of SDI's Board since the early 1990's, Busse and Bates attended Board meetings and were provided with, or had unlimited access to, copies of the SDI's press releases, public filings and other statements alleged to be misleading prior to or shortly after these statements were issued to the public and had the ability to prevent their issuance or cause them to be corrected. ¶¶15, 53.

Accordingly, Defendants' motions to dismiss the control person claims should be denied.

## V.     CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that Defendants' Motions to Dismiss be denied by the Court in its entirety.[18]

Dated: October 15, 2009                    Respectfully submitted,

_____
Deborah R. Gross
Robert P. Frutkin
Tina Moukoulis
Law Offices Bernard M. Gross, P.C.
100 Penn Square East, Suite 450
Philadelphia, PA 19107
Tel: 215-561-3600
Fax: 215-561-3000

John C. Theisen
Marie M. Kolp
Theisen Bowers & Associates, LLC
810 S Calhoun Street Suite 200
Fort Wayne, IN 46802
260-422-4255
Fax: 260-422-4245
Email: jtheisen@tbalawyers.com
Email: mkolp@tbalawyers.com

Scott D. Gilchrist
Cohen & Malad, LLP
One Indiana Square Suite 1400
Indianapolis, IN 46204
Ph. 317-636-6481
Fax: 317-636-2593
Email: sgilchrist@cohenandmalad.com

*Counsel for Plaintiffs*

---

[18]Should the Court grant Defendants' motions in any respect, Plaintiffs respectfully requests that leave to amend be granted as this is the first occasion the Court has considered the sufficiency of the Complaint. *See Schultz v. TomoTherapy Inc.*, 2009 U.S. Dist. LEXIS 58631, at *68 (W.D. Wis. July 9, 2009) (granting leave to amend on motion to dismiss securities fraud claims by holding that the court is "not inclined to assume the PSLRA allows plaintiffs only 'one shot' to meet the high bar it sets."); *see also Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend should be liberally granted, particularly in securities cases).

## CERTIFICATE OF SERVICE

I certify that on October 15, 2009 I electronically filed Plaintiffs' Omnibus Memorandum

In Opposition To Defendants' Motions To Dismiss The Amended Class Action Complaint with

the Clerk of the Court using the CM/ECF system, which provided notice of electronic filing to

the following:

John C. Theisen
jtheisen@tbalawyers.com

Steven L. Jackson
steven.jackson@bakerd.com

Robert S. Walters
rsw@barrettlaw.com

Cathleen M. Shrader
cms@barrettlaw.com

Scott D. Gilchrist
sgilchrist@cohenandmalad.com

Marie M. Kolp
mkolp@tbalawyers.com

Jeremy N. Gayed
jng@barrettlaw.com

Jill M. Baisinger
jbaisinger@morganlewis.com

Christian J. Mixter
cmixter@morganlewis.com

Joel G. Chefitz
jchefitz@mwe.com

I further certify that on October 15, 2009 I mailed copies of the foregoing, by First Class United

States Mail, postage paid, to the following non-CM/ECF participants:

Jeffrey D. Baltruzak
McDermott Will & Emery
227 W Monroe St Suite 4400
Chicago, IL 60606-5096

Laurence Paskowitz
Paskowitz & Associates
60 East 42nd St 46th Floor
New York, NY 10165

Roy L. Jacobs
Roy Jacobs & Associates
60 East 42nd Street 46th Floor
New York, NY 10165

Deborah R. Gross
**LAW OFFICES BERNARD M. GROSS, P.C.**
Suite 450, Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215-561-3600
Facsimile: 215-561-3000
Email: debbie@bernardmgross.com