UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| MARK PANASUK, DAVID ROSS, and DAVID JOHN THOMAS, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO.: 1:09-CV-66-TS |
| STEEL DYNAMICS, INC., KEITH BUSSE, and JOHN BATES, | ) ) ) | |
| Defendants. | ) ) ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant John C. Bates's Motion to Dismiss the Amended Class Action Complaint [DE 41] and Defendants Steel Dynamics, Inc.'s, and Keith Busse's Joint Motion to Dismiss Plaintiffs' Amended Complaint [DE 44], both filed on August 31, 2009. The Plaintiffs in their Amended Complaint [DE 38] filed on July 13, 2009, allege securities fraud. On October 15, 2009, the Plaintiffs filed their so-called Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss the Amended Class Action Complaint [DE 48]. The Defendants each filed replies on November 9 [DE 49, 50], and the motions to dismiss are now ripe for ruling.

## BACKGROUND

Steel Dynamics, Inc. (SDI), located in Fort Wayne, Indiana, is the nation's fifth largest producer of carbon steel products. It is publicly traded on the Nasdaq Global Select Stock Market under the symbol STLD. Keith Busse has been SDI's chief executive officer and a member of the company's board of directors since 1993. Since 2008, Busse has also been the chairman of the American Iron and Steel Institute, and has spoken at its annual convention on

steel demand in the United States. John Bates has been a non-independent director of SDI since 1994, and at all times relevant was the company's largest shareholder. Since 1993, Bates has also been the president and chief executive officer of Ohio-based Heidtman Steel Products, Inc. (Heidtman). Historically, Heidtman has been SDI's largest customer, accounting for approximately four percent of SDI's sales. As a publicly traded company, SDI is governed by the Securities Exchange Act of 1934 (Exchange Act), which requires it to periodically disclose information through prescribed public filings with the United States Securities and Exchange Commission (SEC).

On January 26, 2009, SDI issued its January Release, which was filed with the SEC the following day as a required Form 8-K filing. The Release stated:

> It is strange to be reporting the best year in the company's history and at the same time the company's worst quarter. The steel industry took it on the chin in the fourth quarter as orders dried up, and Steel Dynamics was not exempted. The combination of weaker demand, inventory reductions in both distribution and at the OEM level, and the commercial paralysis brought about by tight credit markets led to very slow order activity. This resulted in fourth-quarter production curtailments at our mills and metals-recycling facilities. We have started the new year with somewhat better activity, but we cannot be certain how long it will take the steel and scrap markets to return to more normal demand patterns. All of our SDI facilities are currently operating well below capacity. However the company is prepared to ramp up very quickly with any pick-up in business activity.
>
> We believe that SDI is well-positioned with our low, variable cost structure and state-of-the-art facilities that are capable of cost-effectively producing excellent, high-quality products. We are optimistic that, even if we continue to encounter lackluster demand for steel and scrap for several quarters, we will return to profitability in the first quarter and remain profitable in 2009, assuming no recurrence of dramatic price swings such as those experienced in the second half of 2008. Our very preliminary estimate is that we could achieve earnings of $0.05 to $0.15 per diluted share in the first quarter. If needed, further guidance will follow later in the quarter as visibility improves. We continue to believe that earnings for the full year 2009 could, under somewhat improved circumstances, be comparable to those achieved in 2008. We are focusing on cash management and controlling costs tightly, utilizing free cash flow to continue to pay down debt

on our revolving line of credit and continue funding capital expenditures for critical projects that are underway. (January Release at 5).

Subsequently, on January 27, SDI held its fourth quarter Earnings Conference Call, in which Busse and others from SDI participated. SDI provided detailed information concerning its fourth quarter 2008 results and their potential impact on SDI's 2009 results. Busse began the call by stating:

> I think I'll probably lead off with the opening statement in the fifth paragraph of our press release, which says it's strange to be reporting the best year in the company's history and at the same time the company's worst quarter and we're thankful to have that quarter behind us.
>
> That quarter obviously was full of pain and agony, must of which was felt in our scrap and scrap processing divisions where substantial losses . . . were incurred, which would tell you that most of the loss we're reporting was at that point in time in that segment and—as expected, I think—and much of it was operating in nature. When scrap goes from $875 a ton, for prime goods, down to $175 a ton month-by-month until it reached its bottom you can imagine the losses were substantial. And I'm happy to be able to report that we think that the processing division will be back in the black in the first quarter and we'll have an operating profit during the quarter. So we're pleased about that. (Call Transcript at 1).

Busse later stated:

> So, we will generate decent earnings—not decent, but I mean, given the fourth quarter climate, rebounding earnings, let's put it that way. We had earnings in the fourth quarter but offset by other issues from a total company perspective, but we should generate earnings in the first quarter in almost all of our steel divisions. (Call Transcript at 3).

In discussing inventory levels, Busse stated:

> I might just briefly comment on our inventories. As [was] said earlier, the inventories at the scrap processing unit are in pretty good shape, but flow is running at . . . half speed, or thereabout. So flow is down due to the industrial environment and we operate for the most part in a winter climate where flows are impacted seasonally as well. So—and of course flows would be down because of the automotive shutdowns that occurred throughout in late December and have continued throughout the month of January.

3

> Inventories at our steel divisions are really in bad shape, at four of the five. The pricing is in good shape now at four of the five, you might say, but we have a lot of inventory at Butler. We probably—and when you look at it all collectively, the push come to shove, we can probably wring $75 to $100 million of cash out of those inventories by allowing them to decline. It's tough to get them to decline when you're operating at only about 50%, thus they've remained high at flat-rolled throughout the quarter, but as I said [are] really in pretty good shape elsewhere throughout the company. So, we still could flush some cash out of inventory if it were necessary, but don't believe that that will be necessary. (Call Transcript at 8).

In defending the assumptions that SDI made about operating capacity, Busse stated that "we will run our flat-rolled divisions at about 60% in the first quarter," and "steel of West Virginia . . . continues to operate at about 45% of capacity." In the question and answer session, the following discussion occurred in which Busse responded to questioning:

> Q: OK, and then with regard to the operating rate you're saying that—if I understand correctly that you're looking for a 60% kind of capital utilization rate in first quarter but the industry is running at kind of mid to low 40s. I was just trying to kind of close the circle there between given the rest of the industry-wide—the industry overall showing a lower rate than you are?
>
> A: Yeah, that was just in flat-rolled, that 60%. We're probably going to operate at about 33% to 40% best case in Structural, and probably somewhere around 60% best case in engineered bars, 50 to 60% same way with small shape. So, the aggregate is something less than 60% for the quarter. (Call Transcript at 16).

Finally, SDI incorporated into its January release the following "Special Note," which first appeared in its 2007 Form 10-K:

> **Special Note Regarding Forward-Looking Statements**
>
> Throughout this report . . . as well as in documents we incorporate by reference or in press releases or oral statements made by our officers or representatives, we may make statements that express our opinions, expectations, or projections regarding future events or future results, in contrast with statements that reflect historical facts. These predictive statements, which we generally precede or accompany by such typical conditional words such as "anticipate," "intend," "believe," "estimate," "plan," "seek," "project," or "expect," or by the words

> "may," "will," or "should," are intended to operate as "forward looking statements" of the kind permitted by the Private Securities Litigation Reform Act of 1995 . . . . That legislation protects such predictive statements by creating a "safe harbor" from liability in the event that a particular prediction does not turn out as anticipated.
>
> While we always intend to express our best judgment when we make statements about what we believe will occur in the future, and although we base these statements on assumptions that we believe to be reasonable when made, these forward looking statements are not a guarantee of performance, and you should not place undue reliance on such statements. Forward looking statements are subject to many uncertainties and other variable circumstances, many of which are outside of your control, that could cause our actual results and experience to differ materially from those we thought would occur. (January Release at 6).

After the release of SDI's reported results, its stock price increased from a close of $10.24 on January 26, to a price of $11.78 on January 27, to a price of $13.08 on January 29. Between January 29 and February 9, Defendant Bates sold over 2.5 million shares of SDI stock for proceeds of approximately $30,704,277.00.

On February 27, 2009, SDI filed its 2008 Form 10-K, which was signed by Bates and Busse. In stating operating results comparing 2008 with 2007, the form disclosed that SDI's steel operations' cost of goods sold "included approximately $26 million in increased costs in order to value our inventories at market value, which was below our cost." The form further disclosed that SDI's metals recycling operations' "cost of goods sold included approximately $10 million in increased costs due to reduction in inventory values that were recorded at a co[s]t level which was higher than current market values." (2008 Form 10-K).

On March 11, 2009, SDI issued a press release in which it updated its outlook for the first quarter of 2009. It stated: "Due to continued weakness in market conditions, the company is reducing its first quarter estimate of earnings from $0.05 to $0.10 per diluted share, to a loss of

$0.40 to $0.45 per diluted share." (March Release at 4). The Defendants attributed an estimated $70 million in losses to non-cash inventory adjustments at its Flat Roll Division, and disclosed that the metals recycling operations were expected to report a loss. After the press release, the price of SDI common stock dropped by $1.30 to $7.25 on March 12, a decline of 15%.

## LEGAL STANDARDS

### A.  The Motion to Dismiss Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. To state a claim under the federal notice pleading standards, all that a complaint must do is set forth "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for relief sought." Fed. R. Civ. P. 8(a). Factual allegations are accepted as true and need only give "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) (other citation omitted). However, complaints must provide more than labels and conclusions, formulaic recitations of the elements of causes of action, and facts that do not raise a right to relief above the speculative level. *Bell Atl. Corp.*, 550 U.S. at 555. Thus, a plaintiff's allegations must show that his entitlement to relief is plausible, rather than merely speculative. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir. 2008). When ruling on Rule 12(b)(6) motions to dismiss, courts accept as true all well-pleaded allegations, view complaints in the light most favorable to the plaintiffs, and draw all reasonable inferences in their favor. *Id.* at 1081.

In ruling on Rule 12(b)(6) motions to dismiss, courts generally must confine their inquiry to the factual allegations set forth within the operative complaints. *Rosenblum v. Travelbyus.com*, 299 F.3d 657, 661 (7th Cir. 2002). Thus, when parties seeking dismissal under Rule 12(b)(6) submit documents with their motions to dismiss, courts either must ignore the documents or convert the motions to ones for summary judgment. Fed. R. Civ. P. 12(b); *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Under Rule 10(c), a "copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). In the Seventh Circuit, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings," and may be considered on a motion to dismiss, "if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assoc.*, 987 F.2d at 431. Documents that fall within this "narrow" exception must be "concededly authentic." *Tierney,* 304 F.3d at 738. Under the exception, the Seventh Circuit has, on several occasions, affirmed the district court's consideration of extraneous materials not attached to a complaint where a claim arises from a contract or other written agreement between the parties. *See Venture Assoc.,* 987 F.2d at 431–32; *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir. 1994).

Where fraud is alleged, Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff in a typical fraud case must, in addition to stating a facially plausible claim for relief, also allege "the who, what, when, where, and how" of the fraud claim. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted).

## B. The Securities Fraud Standards

The Plaintiffs' Amended Class Action Complaint asserts two potential claims. The first potential claim arises under § 10(b) of the Exchange Act, and SEC Rule 10b-5. It is brought against all of the Defendants in this action. In a typical § 10(b) action, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 155 (2008)).

The second potential securities claim is brought against only the individual Defendants under § 20(a) of the Exchange Act. Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable . . . with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here a violation of § 10(b). *See Pugh*, 521 F.3d at 693 (citing *Southland Sec. v. INSpire Ins. Solutions*, 365 F.3d 353 383–84 (5th Cir. 2004)).

Furthermore, the Private Securities Litigation Reform Act of 1995 (PSLRA) provides that a complaint in a securities fraud action must "with respect to each act or omission . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This required state of mind in a § 10(b) case is scienter, which means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh*, 521 F.3d at 693 (citing *Higginbottom v.*

*Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). In the Seventh Circuit, scienter is adequately pleaded by alleging facts that demonstrate that either a defendant knowingly made a false statement or recklessly disregarded a substantial risk that it was false. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). To satisfy the "strong inference" of scienter, a court must consider the totality of the facts alleged to determine whether they give rise to "an inference of scienter at least as likely as any plausible opposing inference." *Id.* at 705 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* 437 F.3d 588, 594 (7th Cir. 2006)).

In the securities fraud context, the Seventh Circuit has rejected the "group pleading doctrine," a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations. *Pugh*, 521 F.3d at 693. Thus, the Plaintiffs must create a strong inference of scienter for each individual Defendant.

Additionally, the PSLRA immunized certain types of so-called "forward-looking statements" from suits for securities fraud. The PSLRA defines forward-looking statements to include statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements "of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management"; and statements "of the assumptions underlying or relating to any statement" described above. 15 U.S.C. § 78u-5(i)(1). Three types of forward-looking statements are exempted: (1) forward-looking statements accompanied by "meaningful cautionary language"; (2) forward-looking statements that are immaterial; and (3) forward-looking statements where the plaintiff cannot show that the statements were made with "actual knowledge" that the statements were false and

9

misleading. 15 U.S.C. § 78u-5(c)(1). Simply stated, the safe harbor provision has three entrances, and a statement that achieves entry into any one is immune from liability.

## DISCUSSION

In their Amended Class Action Complaint, the Plaintiffs seek to allege causes of action based upon the January press release and conference call, and the February SEC filing. The claims are asserted against SDI, Busse, and Bates. While SDI and Busse chose to file a Joint Motion to Dismiss, Bates filed a separate Motion to Dismiss with arguments specific to him. However, the Court finds dispositive issues common to all of the Defendants that allows it to address the motions to dismiss together. The Court will first address the threshold matter of whether the Defendants' motions are properly considered motions to dismiss, in light of the fact that they contained attached documents. Next, the Court will address the February SEC filing first, as the Defendants address standing to make the claim, but not the merits. The Court will ultimately address the January press release and conference call.

**A.    The Motions to Dismiss**

The Court notes that in the two motions to dismiss, the Defendants attached a total of sixteen documents. While this does not automatically convert the motions into motions for summary judgment, the only documents that the Court can consider at this point are those "referred to in the Plaintiff[s'] claim and central to [their] claim." *Venture Assoc.*, 987 F.2d at 431. These documents must also be "concededly authentic." *Tierney*, 304 F.3d at 738. The Court finds that in this case it may consider four extraneous documents: (1) the January 2009 Press

Release; (2) the January 2009 Call Transcript; (3) the February 2009 Form 10-K; and (4) the March 2009 Update. All four of these documents were referenced extensively in the Plaintiffs' Complaint and form the essence of their case. Furthermore, all four are concededly authentic, and are cited by both parties in their briefing.

B.      The February Form 10-K

The Court need not address the alleged misrepresentations or omissions as to the February Form 10-K, because the Plaintiffs have no standing to bring this claim. Of the two lead Plaintiffs, the last stock purchase by David Ross occurred on February 19, 2009, and the last stock purchase by David John Thomas occurred on February 9, 2009. Thus, neither made any purchases after the allegedly false statements were made in the Form 10-K filed on February 27, 2009.

In attempting to rebut this argument, the Plaintiffs contend that many courts have held that class representatives do have standing to assert claims under Section 10(b) arising from statements made after the class representative purchased shares. However, Seventh Circuit law holds that false statements made by defendants after the named plaintiff in a class action suit last purchased stock may not "form the basis for Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992). The Seventh Circuit noted that it "presume[s] only that the market is efficient, not clairvoyant," and affirmed the district court's dismissal of a claim regarding statements made after the named plaintiff's purchase. *Id. See also Ong ex rel. Ong IRA, No. 03 C 4142*, 2004 WL 2534615, at *23 (N.D. Ill. Sept. 27, 2004) (dismissing claims

11

based on post-purchase statements because the "price at which Plaintiffs purchased their debt securities . . . could not have been affected by statements made after that date"); *Heartland Fin. USA, Inc. v. Fin. Insts. Capital Appreciation Partners, I, L.P.*, No. 02 C 3982, 2002 WL 31819008, at *7 (N.D. Ill. Dec. 12, 2002) (dismissing the claim because the alleged fraud "occurred long after Plaintiff's investment"); *Anderson v. Abbott Labs.,* 140 F. Supp. 2d 894, 908 (N.D. Ill. 2001) ("Statements made after named plaintiffs purchased their stock cannot form the basis for § 10(b) liability.").

The Court notes that some case law within the Seventh Circuit suggests that not *every* named plaintiff must have standing for every claim asserted. *See Great Pa Carpenters Pension Fund*, 2005 WL 61480 at *8 (N.D. Ill. Jan. 10, 2005); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 706 (N.D. Ill. 2005). However, it knows of no, and is not presented with any, binding Seventh Circuit law that suggests that a class has standing to pursue a claim where *no* lead plaintiff bought stock after the alleged misrepresentation. Accordingly, the Court finds that the Plaintiffs have no standing to challenge the Form 10-K statements, and the motions to dismiss will be granted as to those claims.[1]

## C.     The January Press Release and Conference Call

In their Amended Complaint, the Plaintiffs allege fraud in three categories of statements in the January release and call: (1) statements and assumptions relating to SDI's first quarter

---

[1] The Court acknowledges that the Plaintiffs have requested to amend the Complaint to join an additional plaintiff who purchased stock after the February date, "if the Court accepts Defendants' argument that *Roots* somehow limits the standing of the Lead Plaintiffs." The Court cannot now rule on that issue, which the Plaintiffs presented as a footnote, because the Plaintiffs have not provided critical details, such as who this additional Plaintiff would be, and the date of his last stock purchase. The Plaintiffs have not properly requested leave to amend their Complaint, submitted a proposed Second Amended Complaint, or made the necessary showing under Rule 15(a). For these reasons, the Court denies the Plaintiffs' request without prejudice.

12

2009 earnings guidance of $0.05 to $0.15 per diluted share; (2) statements relating to SDI's anticipated inventory condition for the first quarter of 2009; and (3) statements regarding anticipated 2009 demand and pricing for SDI products. This Section will first address whether the statements in question are properly classified as forward-looking, and then whether the statements are protected by the PSLRA's safe harbor provision.

*1. Forward-Looking Statements*

At first glance, the statements in question would seem to conform perfectly to the PSLRA's definition of forward-looking, as they all relate to a "projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure, or other financial items." However, in arguing that the statements are not properly categorized as forward-looking, the Plaintiffs argue that because the projections were based on the knowledge of *current* demand, inventory levels, shipments, prices, and economic conditions, the statements were statements of *past* or *present* fact, which are not entitled to PSLRA protection. In support of their theory, the Plaintiffs reference *Takara Trust v. Molex Inc.*, 429 F.Supp.2d 960, 974 (N.D. Ill. 2006). However, the instant case is distinguishable from *Takara,* and merits a different result. In *Takara,* all of the statements at issue were about the present, the time at which the statements were made. The statements in question included language like: "*known* trends and uncertainties," "raw materials are fairly stable *now*," and "we are pleased with the strong growth in earnings." *Id.* (emphasis added). In other words, the company in *Takara* lied about things it already knew, but the instant Plaintiffs accuse the Defendants of making projections based on incomplete information. Thus, the Plaintiffs' argument is not that the statements are not forward-

13

looking—their argument is more properly considered an argument as to whether the forward-looking statements were *meaningful*, or made with *knowledge of actual falsity*, an argument that is addressed in the following sections.

### 2. *Meaningful Cautionary Language*

Because the Court finds that the statements are forward-looking, they will be protected by the PSLRA's safe harbor provision if they fall into one of the three gateways, two of which are applicable here. The first the Court will address is that of "meaningful cautionary language." Cautionary language is meaningful if it "point[s] to the principal contingencies that could cause actual results to depart from the projection." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). "The statute calls for issuers to reveal the important factors but not to attach probabilities to each potential bad outcome, or reveal in detail what could go wrong." *Id.* "[A]s long as the firm reveals the principal risks, the fact that some other event caused problems cannot be dispositive. Indeed an unexpected turn of events cannot demonstrate a securities problem at all, as there cannot be fraud by hindsight." *Id.* at 730 (citations omitted).

That the language used by the Defendants was cautionary is well-documented. To reiterate, the January Release included the following language: "we *cannot be certain* how long it will take the steel and scrap markets to return to more normal demand patterns"; "We are *optimistic* that . . . we will return to profitability"; and "Our *very preliminary estimate* is that we *could* achieve earnings of $0.05 to $0.15 per diluted share in the first quarter . . . . We continue to *believe* that earnings for . . . 2009 *could* . . . be comparable to those achieved in 2008." (emphasis added in all quotations). Similarly the language of the conference call can only be

14

described as cautionary: "*No one has good visibility going forward*"; and "*Our best guess* at this time is that we would achieve somewhere between $0.05 and $0.15 in diluted earnings." (emphasis added). And, of course, the Special Note to the January Release and conference call specifically explicated that any such predictive statements were meant to be cautionary.

Still, the Plaintiffs contend that because the Defendants knew of certain information that they chose not to disclose, any amount of cautionary language could not have been meaningful. Specifically, they argue that the Defendants chose not to mention that Heidtman would not be increasing orders or taking delivery of additional SDI products in the first quarter of 2009 to reverse the weak demand; that SDI's operations were running at less than 50% of capacity; and that SDI's inventories were at excessive levels and were recorded at cost levels higher than current market levels.

However, upon reviewing the disclosures, it does not appear that any "principal" or "important" risk was omitted. With regard to Heidtman not increasing its orders, SDI specifically cautioned that its steel division would run at about 60% and that other divisions would run at lower percentages, "[s]o the aggregate is something less than 60% for the quarter." With regard to SDI's inventory and operating capacity, Busse warned in the conference call that "we have a lot of inventory at Butler"; that inventories have "remained high"; and that "it's tough to get [inventories] to decline when you're only operating at 50%." The Court finds that these cautionary statements are meaningful. When a Plaintiff discloses the potential financial effect of losing a customer that makes up 4% of annual sales, it is not necessarily required to disclose specifically that the customer was lost. This is not the stuff of which securities fraud is made. Consequently, the statements made in the January Release and Call find safe harbor under

the meaningful cautionary language provision.

### 3. *Actual Knowledge of Falsity*

In the alternative, the Court finds that the Defendants' statements satisfy the third prong of the PSLRA safe harbor provision.[2] To survive a motion to dismiss under the third prong, the Plaintiffs must allege facts that "support a strong inference that the defendant acted knowingly" in making the allegedly fraudulent representation. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 848 (N.D. Ill. 2003) (citations omitted). The Plaintiffs, citing the case of *In re Ulta Salon, Cosmetics & Fragrance, Inc.*, contend that the Defendants' projections were false and misleading because they were "made without a reasonable basis or disclosed other than in good faith." 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009). However, the facts of the instant case do not conform to the facts that proved dispositive in *Ulta Salon*. In *Ulta Salon*, the defendants had failed to use data to disclose accurate inventory levels and expenses in their public disclosure. In other words, they willingly ignored data in making revenue projections. No facts are alleged in this case that rise to the same level of falsity or representation. The most the Plaintiffs claim here is that the Defendants failed to *disclose* certain facts that led to their projections. Nowhere do they allege that the Defendants willingly ignored any facts in making the projections. Again, this is not a sufficient basis to survive a motion to dismiss in this securities fraud case.

## CONCLUSION

For the foregoing reasons, Defendant John C. Bates's Motion to Dismiss [DE 41] is

---

[2] The first prong of the safe harbor provision—meaningful cautionary language—is independently dispositive. The Court addresses the third prong as an alternative basis for ruling.

GRANTED, and Defendants' SDI's and Keith Busse's Motion to Dismiss [DE 44] is GRANTED.

SO ORDERED on December 21, 2009.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION